## BETTS *vs.* THE STATE OF GEORGIA.

1. That the court refused to continue a criminal case on account of the absence of witnesses, but sent for such witnesses and had them brought into court early in the trial, and they were all sworn and testified, is no ground for a new trial.

(*a.*) Where, before the witnesses arrived, the solicitor general agreed what facts they would testify to, and that he would not controvert them, upon their coming into court shortly after the trial began, there was no error in allowing the agreement to be withdrawn.

2. In a trial for murder depending on circumstantial evidence, it having been shown that deceased was killed and robbed, and that shortly before the killing he had bills of certain denominations in his possession, there was no error in allowing testimony that on the same day the prisoner had like bills about his person, that he endeavored to conceal them by throwing them behind him, and when asked about them denied all knowledge of them.

3. Although at the request of defendant's counsel in a criminal case the witnesses had been sworn and put under the rule, yet it was no ground for a new trial that a witness who had remained in the court room was allowed to testify merely to the correctness of a diagram he had made of the scene of the homicide, over defendant's objections.

(*a.*) Where the son-in-law of deceased was, on application of the solicitor general, allowed to remain in court to assist in the prosecution, the other witnesses having been sworn and put under the rule, it was not a good ground for new trial that he was permitted to testify over objections of defendant's counsel.

4. The deceased having been found dead, apparently killed by blows from a blunt instrument, a maul found near him, which did not usually remain in that place, his hat found a short distance from him, and his shirt with blood upon it, were admissible in evidence.

5. Where counsel for one party elicits from a witness part of a conversation in which he engaged, the opposing party is entitled to have the balance of the conversation related.

6. It is not a good plea in abatement to an indictment that one of the grand jurors who found it had previously been a member of the coroner's jury who sat upon the corpse, and who found that the deceased had come to his death at the hands of the present defendant, and that the killing was murder.

7. The verdict was in accordance with the evidence.

Criminal law. Continuance. Evidence. Witness. Practice in the Superior Court. Indictment. Jurors. Before Judge HILLYER. Clayton Superior Court. September Adjourned Term, 1880.

Betts was indicted for the murder of H. J. Moore. Upon the call of the case he moved for a continuance, which was refused. He then pleaded in abatement that the foreman of the grand jury who found the true bill had been a member of the coroner's jury who found that Moore came to his death at the hands of this defendant, and that the killing was murder. The plea was overruled and the case proceeded to trial. The evidence for the state was to the following effect: On October 28th, 1880, Moore, who lived in the country, went to town and sold some cotton, receiving four twenty dollar bills and one ten, including some silver certificates. On his way home Betts was seen following his wagon and a short distance behind it. Moore drove into his lot and began unhitching his horses. Betts was seen to go toward the lot, then go to the wood-pile and return to the lot with a maul on his shoulder, and shortly after to leave the lot. Within a few minutes Mrs. Moore, seeing the horses standing partly unhitched, went to the lot and found Moore lying on his back, with his skull crushed, his shirt bloody and his hat knocked between the feet of the horses. His head had evidently been crushed with a blunt instrument, and near his head lay a maul. He died in a few minutes after

being found. A short time afterward, on the same day, the sheriff followed defendant, and on coming up with him called to him. Defendant started toward the sheriff and threw behind him some money, which proved to be $131.00, including four twenty dollar bills and some silver certificates. Upon being questioned about it, he denied all knowledge of it. After being arrested, he told the sheriff that he would tell him all about it when he felt better, but never did so. While in jail, a fellow prisoner heard him pray, and in the course of his prayer he said that he was sorry that he had hurt the old man, as he had gotten into trouble about it.

The evidence for the defense was mainly to show that the prisoner had money amounting to over $100.00 before the homicide, and did not obtain that found on him from the deceased; also to show that the prayer of the defendant, testified to by a witness for the state, was not heard by other prisoners near by in the jail.

The jury found the defendant guilty. He moved for a new trial, which was refused, and he excepted.

For the other facts see the decision.

W. W. BLACK; J. S. BOYNTON; W. W. GAY, for plaintiff in error.

CLIFFORD ANDERSON, attorney general; B. H. HILL, Jr., solicitor general for the state.

SPEER, Justice.

Thomas Betts was, at the September adjourned term, 1880, of Clayton superior court, indicted for the offense of murder.

The indictment charged him with having, on the first of November, 1880, with a large maul and other instruments likely to produce death, killed and murdered one Hilliard J. Moore, in said county.

When the case was called for trial the prisoner made a motion to continue his case for the absence of Leonard

King, Colley Freeman, Annie Smith and Kittie Smith, all of whom resided out of Clayton county, and made a showing what he expected to prove by said absent witnesses. Officers were despatched for said witnesses and the decision on the motion postponed. Two days after, one ot the witnesses appeared, and the solicitor general and counsel for the prisoner then entered into a written admission of what the other absent witnesses would testify to, the solicitor general agreeing "not to controvert the truth thereof." In an hour or two after the trial began the absent witnesses appeared in court, and the solicitor general asked permission to withdraw his written contract as to what the absent witnesses would testify, which the court allowed, and prisoner excepted.

On the arraignment of the accused, he filed a special plea in abatement to said bill of indictment, alleging "that James Waldrup, the foreman of the grand jury, who found and preferred said bill, was a member of the coroner's jury which sat to inquire into the cause of the death of deceased, Moore, and said jury had returned a verdict that deceased came to his death by the hands of accused, and the act was murder, and that for this cause, Waldrup was not a competent juror, and that he ought not to be compelled to plead to said indictment." The court overruled said plea.

Counsel for prisoner then demanded that all of the witnesses for the state should be sworn and separated from each other during their examination. When Tigner and Bishop, two of the witnesses for the the state, were, during the trial, offered, prisoner objected because they had not been placed under the rule, as demanded by counsel, and separated from the witnesses testifying. The objection was overruled and witnesses sworn.

Under the evidence submitted and charge of the court, the jury found the defendant guilty of murder, whereupon his counsel made a motion for a new trial,

1. Because the court overruled the motion for a con-

tinuance on account of the absence of the four witnesses named, and when the witnesses appeared allowed the solicitor general to withdraw his consent to the written statement of what he had admitted they would testify to.

2. Because the court erred in admitting the testimony of Scott Archer about the prisoner's having money at the time of his arrest, and of his having, at the same time, attempted to conceal the fact by throwing it off his person, there being no evidence that the money belonged to the deceased.

3. Because the court erred in allowing the witnesses, Tigner and Bishop, to testify over the objection of defendant, they having remained in court and heard the testimony of the other witnesses in violation of the request made at the opening of the case.

4. Because the court erred in admitting in evidence, over objections, a plat representing the scene of the homicide, and also a maul, bloody shirt and hat, because none of them illustrated the issue on trial.

5. Because the court erred in admitting the testimony of Andrew Murphy, over objection of counsel for defendant, who testified " that Nash (a witness) said to him (witness) he was going to listen at what defendant was saying, and after he had listened, came back and told said Murphy that the defendant had said ' he was sorry he had knocked the old man in the head, for he had got into trouble about it.' "

6. Because the court erred in overruling the plea filed by the defendant objecting to the competency of Waldrup, the foreman of the grand jury, who returned the bill on the ground that he was on the coroner's jury who had returned a verdict that deceased had come to his death at the hands of prisoner, and that the killing was murder.

7. Because the verdict is contrary to law, to evidence and weight of evidence.

1. We see no error in the judgment of the court, refusing the continuance. The court gave time to defendant

and sent for the witnesses desired, and they arrived soon after the case commenced and were all sworn in behalf of defendant, and we do not see any wrong done him either by refusing a continuance for the term, or allowing the solicitor general to withdraw his written consent to the admission of the written statements as to what their evidence would have been. 47 *Ga.*, 591. With the witnesses present in court, we doubt whether the written admission was proper to go to the jury.

2, 3, 4. Neither do we discover any merit in the second, third and fourth grounds of the motion. It was evident from the evidence the deceased was slain and his pockets rifled. The proof shows that the morning he was murdered, and but a few hours previous, bills of a certain denomination had been paid him for cotton he had sold the same morning. It was shown that bills severally of a similar denomination and amount to those received by the deceased were found the same evening on the person of prisoner, and when arrested he attempted to get rid of them by throwing them from his person behind him, and when he was asked about them denied all knowledge of them; we think the testimony was competent when taken in connection with the acts and denial of the prisoner, especially when it was proved he had possession of them when arrested.

Neither was there any abuse of discretion on the part of the court in allowing Tigner and Bishop to testify. The first merely testified as to the correctness of a diagram he had made of the scene of the homicide, and Bishop, the son-in-law of the deceased, was, on the application of the solicitor general, allowed to remain in court to assist in the prosecution by the leave of the court granted. So also was the admission of the plat, under the proofs made, competent to illustrate the surroundings of the homicide. The maul, hat and shirt, the latter stained with blood, taken in connection with the character of the wounds upon the head of the deceased, were dumb,

but none the less truthful witnesses of the manner and means by which this inoffensive old man fell at the hands of an assassin almost under the shadow of his own roof and hearing of his family.

5. The testimony of Andrew Murphy, which was objected to, as set forth in the fifth ground of the motion, in his detailing as to what passed between him and one Nash, the court in his approval of this ground says: "The facts he (Murphy) testified to are a part of the same conversation which had already been drawn out from the witness by the counsel for the prisoner, and the court ruled that the state's counsel were entitled to elicit the balance of what was said, and allowed him to do so." Under this statement of the circumstances of the admission of this conversation between Murphy and Nash, there was no error. Where one side elicits a part of a conversation, that the other side are entitled to all that was said at the time in the same conversation, is too well settled to be doubted or questioned.

6. The court overruled the plea in abatement filed by defendant as to the competency of Waldrup as a grand juror, who found the bill, because he had served as a juror on the inquest held touching the murder of the deceased, and this is made the sixth ground of the motion. So far as our examination has extended, we can find no ruling of this court determining the question here made. In other states the rulings on this point are somewhat variant. It is a well recognized rule that a grand juror who had acted in finding a bill is not competent to sit as a traverse juror on the trial of such an indictment ; and in 39 *Ga.*, 118, it was held that a grand juror who had found a bill for trespass, was incompetent to sit as a traverse juror on the trial of the same trespass on the civil side of the court. Further, it has been ruled that if a grand juror is not qualified under the law to serve as such, his presence would vitiate the action of the body. That is that a challenge *propter defectum* would, if maintained,

void the accusation; but we find no ruling by this court that a challenge *propter affectum,* or for favor, would so operate. Bishop in his work on Criminal Procedure, says, " It is widely held, but not universally or on so strong a reason, that one who has expressed an opinion as to the guilt of the prisoner is not competent to investigate his case as a grand juror." Bishop Crim. Proc., 852. 3d Wendell, 314; 7 Iowa, 287, and other authorities cited; But it has not been held in this state, so far as we have been able to find, that a grand juror is disqualified for the reason he may have expressed an opinion even in so solemn a manner as to do so by the return of a verdict on an inquest.

The constitution has required that " the general assembly shall provide by law for the selection of the most experienced, intelligent and upright men to serve as grand jurors." Article VI. Sec. XVIII, Par. II.

The legislature has provided what shall be the qualifications of grand jurors. They shall be male citizens of this state, above the age of twenty-one and under the age of sixty, being neither idiots, lunatics nor insane, who have resided in the county six months. In our statutes, there are provisions made to test and try the competency of traverse jurors; none whatever of the grand jury.

To hold that a grand juror was subject to challenge *propter affectum* would lead to endless embarrassment in criminal proceedings. We presume it rarely occurs that a crime, especially of great magnitude, does not elicit an expression of opinion from that class of citizens who make up the grand jury; to allow this expression to disqualify and vacate an indictment would entail endless delay and embarrassment in the prosecution of crime, and too often secure immunity to the criminal.

Again, if the expression of an opinion would disqualify, then how could a juror act upon facts that came to " his knowledge or observation," as §3917 of the Code requires ? It is their duty as grand jurors to make presentments of

any violation of the laws " which they may know to have been committed at any previous time." If an expression of opinion, even under oath, would disqualify them, when a bill of indictment was quashed or entered *nolle prosequi* for fatal defect, how could the same body remedy the defect by a new bill, if the finding of the first under their oaths was such an expression of opinion as would disqualify them on a subsequent investigation and render them incompetent to act again? Their duty under their oaths requires them " diligently to enquire and true presentments make." But if this diligence used in the discovery of crime, or their personal observation of the commission of crime rendered them incompetent to make presentiment thereof, then fidelity in the discharge of duty would work a practical forfeiture of their position as a juror. We cannot hold to a construction that would entail such unhappy consequences in the effort to suppress and punish crime.

7. As to the last ground in the motion, that the verdict is contrary to law, evidence and weight of evidence, we have to say, that the circumstances prove not only the *corpus delicti*, but link by link bring the mind irresistibly to the conclusion that the accused perpetrated the act and "are utterly inconsistent with any reasonable hypothesis than that of his guilt." And as the cap-stone to this pyramid of proof, the evidence discloses prisoner's free confession in the hour of remorse and guilt, when alone in his prison cell he was imploring mercy from Him who had commanded " thou shalt not kill."

Rarely have the judicial records of this court been stained with a crime of deeper dye. An old and inoffensive man, after selling the produce and receiving the fruits of his labor, is deliberately followed from the market town to his home by this convicted murderer and assassin, and with no other motive than plunder and robbery he prepares himself with a deadly weapon, enters the horse lot of his victim (where he was unhitching his team) and with

.a blow from behind, crushes the skull of deceased with .a wound so deadly that the tongue uttered no sound, and then seizing his money, flees. If this is not murder, the offense is unknown to the law.

Let the judgment below be affirmed