## Lascelles v. The State.

| 90 | 347 |
| 93 | 310 |

| 90 | 347 |
| 106 | 227 |

| 90 | 347 |
| a110 | 249 |

| 90 | 347 |
| 118 | 785 |

| 90 | 347 |
| 121 | 330 |
| 121 | 591 |

| 90 | 347 |
| 125 | 777 |

| 90 | 347 |
| 127 | 278 |

1. The rule that a fugitive from justice, surrendered for trial by a foreign country under treaty stipulation, cannot, after his extradition, be tried for an offence not embraced in the demand or application on which he was surrendered, does not apply to fugitives from justice fleeing from one State of the American Union to another and surrendered on demand under the provisions of the constitution of the United States. These latter may be tried for any offence committed by them in the State to which they are returned, though the offence may have been committed before the demand and surrender, and though it be not the particular offence on account of which they were brought back for trial.

2. By the act of February 26th, 1877 (Code, §4649), a *nolle prosequi* may be entered by the solicitor-general in any criminal case with the consent of the court after an examination of the case in open court. This being so, the consent of the court is conclusive upon the validity of a *nolle prosequi* which the court has allowed the solicitor-general to enter before putting the accused on trial. The latter, when arraigned upon a bill of indictment subsequently found and returned by the grand jury for the same act or offence, cannot, by plea in abatement or motion to quash, draw in question the rightful disposition of the former bill by *nol. pros.*

3. A plea in abatement to a bill of indictment, or a motion to quash the bill, is not sustainable which sets up that a member of the grand jury that found the bill was related by affinity to the prosecutor within the fourth degree, his wife being a second cousin of the prosecutor. Such relationship, according to the settled law, belongs to the same class of causes of challenge as does the fact of service by the juror on a previous trial or investigation of the same case or matter in controversy.

4. Several counts, each charging forgery, one by falsely and fraudulently making a bill of exchange in a fictitious name, another by fraudulently obtaining a sum of money by color of the same bill (alleging it to be drawn in a fictitious name), another for fraudulently obtaining a sum of money by color of the same bill, and another for falsely and fraudulently uttering the same bill, the last two counts, however, not alleging the bill to be drawn in a fictitious name, may be joined in the same bill of indictment, all the offences being felonies and offences of the same nature according to the code, §§4453, 4455, 4450. And at the trial the State would not, as matter of law, be bound to elect on which particular count or counts it would rely for a conviction.

5. On the counter-showing, taken in connection with the showing for a continuance, there was no abuse of discretion by the presiding judge in denying the application. And no error appears in ad-

mitting in evidence the facts constituting the counter-showing, most of them consisting of acts and declarations by the prisoner himself which were inconsistent with the good faith of his showing, and those which consisted of declarations by others not being separately objected to on the ground that they were hearsay.

6. On a trial for forgery, representations by the accused calculated to make an impression that he was a person of wealth and respectability, some of the representations being made to one of the persons afterwards defrauded by the forgery and some of them to the brother of that person, the brother being the medium of introduction between the accused and one of the members of the firm defrauded, are admissible in evidence on behalf of the State, there being facts and circumstances in evidence tending strongly to prove the falsehood of the representations. The fact that the accused pretended to write to his father for a large sum of money and caused an envelope addressed to the person he said was his father to be mailed, which envelope on being aftewards returned unopened by due course of mail was found on examination to contain nothing but a blank piece of paper, is admissible in evidence together with the envelope and piece of paper.

7. When a man assumes not only a name which is not his own, but the relationship of son to another who has no such son, and in that name draws a bill of exchange and passes it for value to a person who believes he is dealing with a genuine and not a fictitious son of the alleged parent, the name as to that transaction is fictitious, and under section 4453 of the code the bill is one drawn in a fictitious name and the drawer is guilty of forgery.

8. Designedly obtaining money with intent to defraud by color of a bill of exchange drawn in a fictitious name is a felony under section 4455 of the code, such a bill being embraced in the words " any counterfeit letter or writing made in any other person's name, or fictitious name."

9. The evidence warranted the verdict, and there was no error in not granting a new trial on any one of the grounds contained in the motion therefor.

August 23, 1892.

Criminal law. Interstate law. Extradition. Indictment. Practice. Pleading. Juror. Forgery. Continuance. Evidence. Before Judge MADDOX. Floyd superior court. September term, 1891.

The indictment charged that Sidney Lascelles did falsely and fraudulently draw, make and forge a certain bill of exchange (setting it out) in the fictitious name

of Walter S. Beresford, when his real and true name
was Sidney Lascelles, with intent then and there to de-
fraud Hamilton & Company, a mercantile house, etc.
The bill of exchange purported to be a check for two
hundred pounds on a London bank in favor of Hamil-
ton & Co., signed "Walter S. Beresford." The second
count charged that Sidney Lascelles did designedly;
and by color of a counterfeit writing falsely made by
him in the semblance of a foreign bill of exchange, and
in the fictitious name of Walter S. Beresford, when his
real and true name was Sidney Lascelles, in words and
figures as followed (again setting out the bill of ex-
change), obtain from Hamilton & Company, a mercan-
tile house, etc., $970 in money of the value of $970,
with intent to defraud said Hamilton & Company. The
third count charged that Sidney Lascelles did de-
signedly, and by color of a counterfeit writing falsely
made in the semblance of a foreign bill of exchange,
and in the name of Walter S. Beresford (concluding
like the second count). The fourth count charged that
Sidney Lascelles did fraudulently utter, publish and
pass as true, with intent to defraud said Hamilton &
Company, a certain false and fraudulent forged and
counterfeited bill of exchange (setting it out) well know-
ing that said bill of exchange was falsely and fraudu-
lently made, forged and counterfeited. The jury found
the defendant guilty on the first and second, and not
guilty on the third and fourth counts. The assign-
ments of error covered by the first three divisions of the
decision, and the facts touching them, being sufficiently
set forth in the opinion, are omitted from this state-
ment. The defendant demurred to the indictment on
the following grounds: (1) There is a misjoinder of
counts, for that there are separate and different offences
charged. (2) The first count undertakes to charge
an offence under the code, §4453; the second and

third counts undertake to charge separate offences under the code, §4455; while the fourth count undertakes to charge an offence under the code, §4450; all of which several counts are for separate and different offences, are based upon separate statutory provisions, and charge separate statutory crimes. (3) None of the counts set forth a sufficient offence or crime so plainly that the nature of the offence may be easily understood by the jury. (4) The first count charges no offence under the law, especially no offence under the code, §4453, in that it alleges that the bill of exchange was falsely and fraudulently forged with intent then and there to defraud Hamilton & Company, etc. Defendant alleges that the element of intent to defraud is not a part of the crime of forgery as provided in the code, §4453. (5) The second count does not set out the name of any person from whom money was obtained, nor does it state from which member of the firm of Hamilton & Company the money was obtained, nor from what agent or employee of that firm it was so obtained; under the code, §4455, it is necessary that the indictment should charge the individual from whom the money was obtained. And so as to the third count. This demurrer was overruled, and the defendant then moved that the State be required to elect on which count of the indictment it would rely, and especially as between the second and third counts, contending that these were inconsistent. The motion was overruled.

The defendant moved to continue the case for the term, which was refused, the court allowing him twenty days to prepare for trial. The showing for continuance was by affidavits of the defendant, dated October 6th and 7th, and by the statements of his counsel in their place. These affidavits are, in brief, that he was extradited in the name of Walter S. Beresford to answer

only the two indictments for larceny after trust and for cheating and swindling; that the indictment against Sidney Lascelles for forgery was not contemplated under the delivery of his person to the law officers of Georgia, nor was there then pending any indictment or warrant for forgery against affiant in either of those names, but this charge was made against him since his incarceration in Floyd county jail; that not having had any previous notice or intimation that the bill for forgery would be found, he has had no opportunity and not sufficient time to prepare for his defence; that in order to make provision for his defence against the prosecutions, he has endeavored to obtain bail and had every reason to believe that such would be obtained, and, as he is informed, bail would have been obtained by him but for the fact that the prosecution in this forgery case has by importunities, threats and menaces, prevented John M. Vandiver, a citizen of the county, from going on his bond; that Vandiver was approached by the prosecution and asked by the prosecutor not to go on the bond; that not being successful in extracting from Vandiver a promise not to go on the bond, said prosecutor threatened Vandiver that if he went upon the bond he would give him trouble. Vandiver is a man of large means, and, as affiant believes, worth $20,000 above all liabilities. He expressed a willingness to go upon said bonds, but, affiant believes, by reason of said action of said prosecutor, Vandiver changed his mind and now declines to go upon defendant's bond. By reason of said action affiant has been unable so far to procure bail, and he believes that the action of the prosecutor has contributed largely to his failure to obtain it. He never contemplated the indictment for forgery, nor suspected that it would be found, until he was so informed by his counsel. He is a British subject, a resident of London, England, and

has been in the United States only since December, 1890, since which time he has travelled over this country and the West Indies. He was only able to secure counsel in said case on Saturday last, and only partially so then, his arrangements for securing counsel only having been completed on the evening of October 5th. Richard Lowndesberry, No. 15 Broad street, New York City, knows affiant and knows his name to be Walter S. Beresford; Colly Colt of the Manhattan Club, New York City, knows the same; and affiant expects their attendance at the next term, and that they will prove that his true name is Walter S. Beresford. John Evans of No. 49 Hanway street, London, has known him for many years, and has never known him otherwise than as Walter S. Beresford. L. G. Genese, of Bloomsberry, London, M. Wheeler of London, and John Heath of Oxford street, London, have known him for a year or more, and never otherwise than as Walter S. Beresford. While the above named witnesses are non-residents of Georgia, affiant's relations and friendships with them are such that he confidently believes he will be able to procure their attendance as witnesses at the next term. His means would be sufficient to enable him to pay their expenses to and from their places of residence. He was an honorary member of the New York Yacht Club and the Manhattan Club of New York, and he expects at the next term to have the attendance of some members of those clubs to testify in his behalf, showing his name to be Walter S. Beresford. He could give the names of a great number of persons in London who know that to be his name. He is unable to state that he expects their attendance at the next term, though he hopes to be able to have them attend. He verily believes that he will secure the attendance of enough of said witnesses to prove to the satisfaction of the court that his name is Walter S. Beresford. No one in

Georgia within his knowledge knows him or has known him of his or their own personal knowledge, or by reputation, for any considerable time, and for this reason he is unable to procure witnesses in Georgia to prove his true name to be Walter S. Beresford. His leaving New York was so sudden and unexpected, that he was unable to make arrangements to procure funds and means for his defence to the charge against him in Georgia. It was only on Friday at noon prior to his leaving New York on the following Monday, that he learned definitely he would be delivered to the law officers of Georgia, and he was retained in the custody of the law officers of New York, and it was impossible for him to arrange his financial affairs for his defence in the employment of counsel, and it was not until the latter part of last week and the first of this week he succeeded in procuring counsel, it being impossible for him to do so, he being without funds and means with which to pay counsel. He makes this showing for continuance, not for the purpose of delay only, but *bona fide* for the purpose of preparing his defence.

The statements of the counsel were, in brief, that Mr. Dean was retained in this case finally on October 5th, and since that time had been engaged in the preparation of the case, but had been unable to prepare it sufficiently for his client to go to trial safely; that from information given by him, the counsel expected to meet this issue at the next term; that Messrs. Ewing and Vandiver were employed to attend to the preliminary matters of the case about a week previously, but were not retained to appear in this case until October 2d and 3d, their first employment being to do what they could in procuring bail, etc.; and that Mr. Wright, the other counsel, was employed on the preceding afternoon.

For counter-showing the State introduced the hotel register of the Central Hotel of Rome, Ga., of the 22d

of September, 1891, showing that the defendant registered the name of his wife as Mrs. Sidney Lascelles.
Also, the testimony of J. C. Moore, that the defendant
stated that he had signed his right name at the Central
Hotel, that he would not suffer his wife to pass under
an assumed name, and that his name was Lascelles.
Also, the affidavit of the defendant for marriage license,
made at Beaver, Penn., at the time of his marriage, before the clerk of the Orphans court of Beaver county,
Penn., in which he swore his name was Sidney Lascelles. Also, the testimony of D. B. Hamilton, that
defendant had said to him that the name he assumed
down here was a fictitious name, that his true name was
Sidney Lascelles, that he assumed the name to elude his
mother-in-law, that he did not want her to get on track
of him, that he assumed the name of Walter S. Beresford; that a good many in bidding him good-bye addressed him as Sidney Lascelles, and that was what his
wife called him; that of his own accord he asked
witness when he got here how he should register his
wife's name, saying he was known here by the name of
Beresford, but his true name was Lascelles, and he was
in a quandary whether to sign his true name, that he
did not think it was proper for his wife to sign under
an assumed name, and that he was determined to register his wife under her true name; that Mr. McGuire
and Mr. Pendleton both repudiated him and said he
was a great fraud. Mr. Pendleton said he came to him
hurriedly; that he was going across the seas to make
some investments of some property in Savannah, to
examine some of the property, and Mr. Pendleton said
he seemed to be of quite good style, and asked him for
a letter, and Pendleton said, without thinking much he
gave him a letter to Mr. Tom McGuire, and said he regretted he did not take time, as he ought, to have
inquired more particularly. Mr. McGuire was very
diligent in pursuing him with telegrams, for he had

perpetrated a great fraud on him. Mr. McGuire said he had applied to him for money on these bogus bonds. McGuire located him by telegrams. He went over to the West Indies and he lost him for a few months. "McGuire was the man that located him for me." Also, the testimony of Harper Hamilton: "I know that Mr. McGuire and Mr. Pendleton repudiated him. I had a very hard time to get him from New York. Had a trial every day for two weeks. He introduced me to his wife as Mrs. Lascelles and in conversation she called him Sidney." The defendant excepted to the allowance of this evidence on counter-showing to be introduced, over his objection that all of it was not proper or relevant on a counter-showing, and that it was not in rebuttal of his showing.

Errors are assigned in the motion for a new trial, upon the admission of the following evidence, over the defendant's objection that it was irrelevant: (1) The testimony of Harper Hamilton, giving the statements made by the defendant while at Etna, some days prior to the signing of the draft alleged to have been forged, to wit: "He told me that he was very wealthy; that his aunt had just died and left him two hundred and fifty thousand dollars; that he had it deposited at the London and Westminster Bank, London; and that his father, Lord William Beresford, was a very wealthy gentleman; and that he was a son of Lord Wm. Beresford of London; and he further stated that he was in the Indian service of the Queen; and afterwards showed me a hat which he said belonged to his uniform that he had worn in India; that he was some officer there in India; that he had often got up at night and heard cases tried, tried them at night as such officer. He said he was just off on furlough; that his salary was eight or ten thousand dollars; and that he had been in the service thirteen years." (2) The testimony of the same witness, giving the circumstances of

the writing of a letter by the defendant to Pendleton
on January 8, 1891, and the address of a letter by him
to Lord William Beresford, which came back to Ham-
ilton & Co. unopened, to wit : "Beresford sat down at
my desk and wrote several letters. It was the 8th day
of January, I think it was. He wrote one letter to
Mr. Pendleton, and he wrote this letter to Lord Wm.
Beresford. I saw it and saw Mr. Wright put the stamp
upon it and mail it. The next time this letter came
into my possession it came back unopened. It came
back to Hamilton & Co. I think it was Alfred or Father
who gave it to me; that is the same letter; it came
back unopened. I carried this letter to New York, and
the district attorney, Mr. Welsh, and Mr. McGuire and
myself opened it. This is the same envelope. This is
the same inclosure, and this is the same letter. We
opened it, and that envelope and that letter have been in
my possession ever since. At the time of writing this let-
ter he said he had written his father that he had made
some investments here, and to send him twenty-five
thousand dollars, or twenty-five thousand pounds; I am
not certain which ; twenty-five thousand dollars I think
it was." The sheet contained in the envelope to Beres-
ford was shown to the jury, and was a blank sheet of
paper. (3) The envelope and blank sheet contained
therein, addressed to Lord William Beresford, Water-
ford Castle, Leeds, England, and proved to have been
addressed by defendant and mailed by Hamilton & Com-
pany on January 8, 1891. (4) The testimony of Pen-
dleton, stating the conversation between him and
defendant in London, touching a friend of defendant
in Savannah and a plat of property at or near Savan-
nah, and in regard to a letter read by defendant to
witness to a friend in Savannah, to wit : "He says,
'Are you going to sail for America on the Umbria?' I
told him no. He said he was going to sail for America on
the Umbria; he says, 'I believe you are from Georgia?'

I told him yes. He says, 'Are you acquainted in Savannah?' He told me he had a friend in Savannah who had invested about one hundred and twenty-five thousand dollars in America at different times. He asked me if I would go to his chambers and see a plat of some property in Savannah which was offered him, and tell him what I thought of his property and whether I would advise him to buy or not. I called, and he read a letter. I did not read the letter myself. He said it was from a friend in Savannah. He read the letter which said, 'Dear Walter'; it said that he had some land which he could buy at a bargain. He showed me a plat of some property and asked my opinion of it. I told him it would do to buy it; that while Savannah was a good solid city, and while I thought an investment there would be perfectly safe, still I did not think that the outcome of property there would be half as great as in the Piedmont belt. Up to that time I had not said anything to him about my business. I told him that I was in the line of promoting business, forming companies, and things of that sort, and was in England for that purpose; that I had some very valuable properties in Georgia and Tennessee, and among them mentioned this Etna property, that it was for sale; told him if he cared to look into it, would give him a letter of introduction to my partner, Mr. McGuire, in New York, which I did. He stated to me that a rich aunt of his had recently died and left him fifty thousand pounds, and that he would like to invest that in America, and that he had some relatives that would also like to invest. I told him I was forming a company for this property, proposed to put a regular manufacturing city. I told him I had already had these papers in the hands of parties and negotiations going on in reference to it, and if he would get up one half of the money, I would undertake to raise the other half. Really, to be candid with you, I did not expect

to hear from him any more." And further, because the court allowed the same witness, over the same objection, to testify touching the continuance of the same conversation, about defendant's representations as to his wealth and the investments he desired to make; and touching the formation of a company to put up a manufacturing city, all of which conversation occurred several weeks prior to the alleged forgery. (5) The letter written by defendant to the witness Pendleton, dated January 8, 1891, and addressed to London, England. (6) The testimony of A. S. Hamilton, as to what defendant said to him in regard to defendant's financial standing, family standing and connections, and defendant's conversation with General Alexander as to Central Railroad stock, to wit: "He told me about his home in England, his father's castle; he also stated when he went to Savannah that he met Gen. Alexander, and he told me he had a good large block of Central R. R. stock that he had bought at 55, and I told him to hold on to it, for it was then worth in the neighborhood of 80 and might reach par. He said that Gen. Alexander, who was on the inside, told him to hold it and he would make a good profit out of it. Said his father was Lord Wm. Beresford, and lived in London, England. He did not tell me what bank he deposited in. Said he had fifty thousand pounds deposited in London. Said he was connected with the service in India. He remarked how poorly the officials of the United States were paid; that the President of the United States only received about fifty thousand dollars per year, and that his father was in the service of England and was about to be retired, or just had been retired on a salary of fifty thousand pounds per year; and he himself was in the service and would soon be retired at ten thousand pounds per year. Said he wrote to his father something about a deposit he had made or should make of twenty-five thousand dollars."

Errors are assigned on the following instructions in the charge of the court:

" You will then look to the evidence and see whether Walter S. Beresford is his true name, and if it is, you need go no further in your investigation, but you should find for the defendant on all the counts; but if you believe from the evidence that Walter S. Beresford is not his name, but his name is Sidney Lascelles, and that the name Walter S. Beresford is a fictitious one, and you further find that he drew the check or bill of exchange with intent to defraud Hamilton & Co., you would be authorized to find the defendant guilty on this count, that is, the first count in the indictment. You may look to and examine all the circumstances which surround the transaction, and if they disclose the fact that he intended to defraud them, then you should convict · him.

" In this charge you will notice that the defendant is charged that he did then and there designedly and by color of a counterfeit writing falsely made by him in the semblance of a foreign bill of exchange. You look at that bill of exchange, and if on the first count you find that the defendant in this case signed a fictitious name, that Sidney Lascelles is his true name, and Walter S. Beresford is a fictitious name, and you further find that he signed that check or bill of exchange, you find that is a fictitious name, and that is a counterfeit check, and you believe he signed that check designedly and with intent to defraud Hamilton & Co., you look to the evidence and see whether he did defraud them out of $970. You are to take into consideration all the facts and all the circumstances that surround the case, and see whether it is true or not. If it is true as charged in the second count of this indictment that he designedly and by color of a counterfeit bill of exchange as charged in this indictment, and intended to defraud

Hamilton & Co. out of this sum under this fictitious bill of exchange as charged in this second count, then you should find the defendant guilty.

" If you find that was not his true name, but his true name was Sidney Lascelles, then, gentlemen of the jury, I charge you that that would be a fictitious name, that was not his true name. If you further find that he drew that bill of exchange in a fictitious name, and he did it with intent to defraud Hamilton & Co., and he did defraud Hamilton & Co. by so drawing that bill of exchange, then you would be authorized to find the defendant guilty upon the first charge, and also the second charge, if you find it to be a counterfeit."

The objections to these charges are, in brief, that the court did not explain that a counterfeit writing presupposes a genuine writing, and nowhere charged that it was incumbent upon the State to prove the genuine writing as well as the writing charged to be counterfeit; that the court did not explain the meaning of fictitious name as used in the statute, defendant insisting that fictitious, as thus used, does not mean a name assumed for a considerable length of time, for purposes other than the act complained of, and in a general way, prior to the act charged to be forgery; that the court nowhere charged that the burden was upon the State to prove that the name of Walter S. Beresford was fictitious, and that this could be true only in the event that there was no such person as Walter S. Beresford; that the court did not instruct the jury that the burden was upon the State to prove that the check signed by the defendant was not a genuine check and not upon a genuine bank without the right in the defendant to draw the same as he did draw it; that the statute does not contemplate the fraudulent intent as in the charge expressed.

The court was requested to give the following in-

structions in charge, and the refusal to do so is complained of as error:

"If you should find that the draft was signed by the defendant in a fictitious name for the purpose of defrauding Hamilton & Co., then I charge you that the State must show that the fictitious name was assumed by defendant for the sole purpose of defrauding Hamilton & Co. It will not be sufficient to prove that this fictitious name was assumed for general purposes of fraud, unless you find that it further appears that the particular forgery was as charged part of that general purpose. If you find the fictitious name (if such the proof shows) the one the defendant had been accustomed to employ, and under which he had done business, then you cannot convict him, but you must find the defendant not guilty. In order that the signing of an assumed name to an instrument should constitute forgery, it is requisite that the name should have been assumed for the purpose of fraud; and where one signs a draft by a fictitious name by which he has long been known, and there is no evidence that this assumed name was assumed for that particular purpose, then you must find for the defendant. The words 'fictitious name,' as used in the statute under which the first and second counts of this bill of indictment is drawn, is a name for which there is no person; but if the person using or signing the name has assumed the same as applicable to himself previous to the act complained and with no intent to commit the act complained of, then the name is not fictitious in the sense used in said statute."

W. W. VANDIVER, EWING & CROSBY, DEAN & SMITH, S. & M. WRIGHT, C. ROWELL and J. W. FAIN, for plaintiff in error.

W. J. NUNNALLY, solicitor-general, J. BRANHAM, W. S. McHENRY and W. J. NEEL, contra.

LUMPKIN, Justice.

1. The plaintiff in error was convicted of forgery. He had been indicted, under the name of Walter S. Beresford, as a common cheat and swindler and for larceny after trust, and upon the indictments for these offences, requisitions were issued upon the governor of New York, and the accused was arrested in that State in compliance with the requisitions, and delivered to the officer appointed in behalf of this State to receive him, who brought him here and delivered him to the sheriff of the county where the indictments had been found. While in jail, where he had been kept continuously from the time he was placed there under the charges made in these indictments, an indictment for forgery was found against him, based upon the same transaction as the charge of cheating and swindling, and he was thereupon convicted. By his motion to quash the indictment and by his plea in abatement, he made the objection that it was unlawful to try him for an offence not charged in the extradition proceedings, without first allowing him an opportunity to return to the State from which he had been surrendered.

We think this objection was properly overruled. No such limitation upon the right of trial as that contended for is to be found in the constitution and laws of the United States or of this State. That such a limitation exists in cases of extradition from foreign countries, has been determined by the Supreme Court of the United States in the case of U. S. *v.* Rauscher, 119 U. S. 407; and it was contended that the doctrine of that case is applicable to this. In our opinion, the reasons which control in cases of foreign extradition do not apply where the fugitive is surrendered under the provisions of the Federal constitution by the authorities of one State of the Union to those of another. In the first place, the limitation which exists in cases of foreign extradition

is matter of express law.  By the act of Congress of
March 3d, 1869, c. 141, §1, as construed in the Rauscher
case, it is provided that the accused shall be tried only
for the crime specified in the warrant of extradition,
and shall be allowed a reasonable time to depart out of
the United States before he can be arrested or detained
for another offence.  It is significant that Congress,
while thus careful to secure to the fugitive the right
of return in cases of extradition from a foreign coun-
try, has made no such provision with reference to per-
sons surrendered from one State of the Union to
another.  Moreover, the mutual rights and obligations
of foreign governments with respect to extradition, are
defined usually by treaties, in which the agreement to
surrender extends, not as in the case of the States,
under the Federal constitution, to every offence against
the laws of the demanding State, but only to certain
offences specified in the treaty; and this, according to
the views announced in the Rauscher case, is equiva-
lent to the exclusion of the right to try for other offences,
or for an offence other than that for which the fugitive
was surrendered.  In that case the crime for which the
accused was tried was not only a different one from
that for which he was surrendered, but was not one of
those specified in the treaty.  The treaty being, under
our constitution, a part of the law of the land, it was
held to be the duty of the courts to take cognizance of
it and enforce it as such, although in the particular
case the foreign government had not asserted its rights
in the premises.  When we go back of the express law
on the subject, and consider the matter independently
of the statute referred to or of the obligations assumed
by treaty, it will be found that the right of the person
extradited to return to the country from which he was
surrendered, is based upon the right of that country to
afford asylum to the fugitive, and to refuse to give him

over to another except upon such terms as it may see
fit to impose.    It is well settled that the criminal him-
self never acquires a personal right of asylum or refuge
anywhere.    Such right as he may have in this respect
grows entirely out of the rights of the government to
whose territory he has fled.    It matters not, so far as
the right to try him is concerned, that he may have
been abducted while in another State, and brought back
illegally and against his will to the State whose crimi-
nal laws he has violated, nor, in such case, that the
executive of the State from which he was taken has
demanded his return.    Mahon v. Justice, 127 U. S. 700.
See also Ker v. Illinois, 119 U. S. 436, decided on the
same day as the Rauscher case, *supra*.    That the right
to protect the fugitive who has taken refuge in its ter-
ritory exists on the part of every independent nation,
except in so far as it may have agreed to forego the
right, is recognized by the Supreme Court of the United
States in the Rauscher case, as an established principle
of international law.    But to our minds it is clear that
under the organic law of the Union, no such right
exists on the part of the several States with reference
to each other.    The constitution declares that "a per-
son charged in any State with treason, felony or other
crime, who shall flee from justice, and be found in
another State, shall, on demand of the executive author-
ity of the State from which he fled, be delivered up,
to be removed to the State having jurisdiction of the
crime."    (Art. 4, sec. 2, subsec. 2.)    And it is settled
that this provision extends without exception to all
offences punishable by the laws of the State where the
act was done.    It is immaterial that the thing com-
plained of is not a crime in the State in which the
accused is found; nor can the authorities of that State
inquire into the question of his guilt or innocence.
The sole question is, whether he is a fugitive charged

with crime under the laws of the demanding State. If he is, the duty to deliver him up is imperative. The framers of the organic law clearly intended that there should be no reserved right to convert any State into a place of refuge for fugitives from the justice of another, and that State lines should constitute no insuperable obstacle to the enforcement of the criminal laws of any part of the Union, as to offences committed within the field of their operation. By the act of 1793, Congress has constituted the executive authority of the State to which the accused has fled the agency for carrying into effect the provisions of the Federal constitution and laws as to arrest and delivery. His sole function is to ascertain whether the authorities of the demanding State have on their part complied with the constitutional and statutory requirements, and if so, to cause the arrest and delivery of the fugitive. If these requirements are complied with, he has no further interest in the matter and cannot set up any right of his State to protect the fugitive. The sole right which his State can set up as against the right of the demanding State is, that its own justice shall be satisfied if at the time of the demand the accused stands charged with a violation of its laws. In such cases the right of the demanding State is not denied, but is merely suspended until a prior claim shall have been discharged. The imperative duty of delivery, where the Federal requirements are complied with, is recognized in the legislation of this State (Code, §§54, 55), the only reservation of any right of the State being that which has just been indicated. In *Johnston* v. *Riley*, 13 *Ga.* 98, this court held that "when a demand is made by the executive officer of one State for a fugitive from justice who has taken refuge in another State, under the provisions of the constitution and laws of the United States, and a copy of the indictment found or the affidavit made, as provided

by the act of 1793, shall be produced and duly authenticated, as required by the act, charging the person so demanded with having committed a crime against the laws of the State from which he fled, the executive officer of the State upon whom the demand is made for the surrender of such fugitive must be governed by the record produced; he has no authority to make any addition to it, or to look behind the indictment or affidavit, and inquire whether by the laws of his own State, the facts charged therein would constitute a criminal offence; but it is made his *imperative duty*, under the supreme law of the land, which he has sworn to support, to surrender up such fugitive to the authorities of the State whose laws have been violated, having jurisdiction of the crime." On this subject see also 2 Moore on Extradition, §§607, 608 *et seq.*; Spear on Extradition (edition of 1885), 422–434; Hawley on Interstate Extradition, 10 *et seq.*, 48; Kentucky *v.* Dennison, 24 Howard, 99. It may be true that there is no power on the part of the Federal government or of the demanding State to compel performance of this duty, but it is not on that account in any less degree a duty.

If, therefore, the demand cannot, as a matter of right, be refused when made in compliance with the Federal requirements, it would be idle for the authorities of the State to whom the accused was surrendered to set him at large so that another demand might be made, before trying him for an offence other than that charged in the requisition upon which he was surrendered. Certainly they are under no obligation, before trying him for other violations of law, to place the executive of the surrendering State in a position to do or refuse to do that which, under the supreme law of the land, it is his imperative duty to do. If what we have said is true, considerations of comity and good faith on the part of the State to which the surrender was made are

not involved in the matter. Besides, if it is competent for the State in which the surrender is made to impose any conditions not imposed by the Federal laws, no such condition appears in this case. There was no executive pledge on the part of this State and no stipulation on the part of the State of New York, so far as the record discloses, which could give rise to an implication of bad faith; and the courts of that State have declined to recognize any such limitation upon the right of trial as that contended for in behalf of the accused in this case. See People *ex rel.* Post *v.* Cross, decided by the Supreme Court, June 1, 1892 (19 N. Y. Supp. 271); affirmed by the Court of Appeals, 32 N. E. Rep. 246.

We think no further discussion is required to show that the reasons for this limitation in the case of foreign and independent nations, do not control as between States united under a common supreme government, the objects of whose union, among others, are " to establish justice, insure domestic tranquillity " and " promote the general welfare." (See preamble to constitution.) As between States occupying these relations to each other, the right of one to protect fugitives from the justice of another, or to place any check or limitation upon the right' of trial by another, would be wholly inconsistent with the objects of the union, and besides could be of no value, while to each of the States, as well as to the whole Union, it is of the highest importance that each shall have the right to punish all offenders against its laws, no matter to what part of the common territory they may have fled.

The conclusion reached in this case, although not in accord with the views announced by some courts, is sustained by a decided preponderance of authority. The cases cited *contra* which are nearest in point are those of State *v.* Hall, 40 Kan. 338, and *Ex parte*

McKnight (Ohio), 28 N. E. Rep. 1034. In the case of Cannon, 47 Mich. 481, also cited *contra*, the question arose upon an inquiry as to the legality of an arrest in a bastardy suit, after the defendant had been brought back to the State upon another charge; and according to the view of the court, the bastardy proceedings were not criminal in the strict sense of the term, and involved no offence for which extradition could have been demanded. The main ground upon which these decisions rest is, that it would be bad faith and a perversion of justice, after procuring the surrender of a person upon one charge, to try him upon another. Such is the view expressed by Mr. Spear in his work on Extradition, 525 *et seq.*, and by Judge Cooley in the Princeton Review, Jan., 1879, quoted from at some length in the Kansas decision, *supra*. This view seems to have been influenced to some extent by the decisions as to the illegality of arrest in civil actions of parties brought within the jurisdiction on a criminal charge, as well as by the supposed analogy, which we have already discussed, to cases of international extradition. We think there are various reasons why cases involving the fraudulent use of criminal process by private individuals to promote the ends of a civil action, stand upon an altogether different footing from cases where a State which has brought a person within its jurisdiction upon one charge, proceeds afterwards to try him for other offences against public justice. A controlling distinction to be noted is, that a person against whom it is sought merely to establish or enforce a civil liability, has personal rights which are violated by his being brought into the jurisdiction by fraud, while, as we have seen, an offender against the criminal laws of the State acquires no right by his flight or absence from the jurisdiction, which the courts, in the administration of those laws, are bound to regard when he is again

found within the jurisdiction. This was the doctrine of the common law courts, and may now be regarded as settled in this country by the decisions of the Supreme Court of the United States in the cases of Ker and Mahon, *supra*. The manner in which the accused was brought into the jurisdiction is not taken into account unless some right of the government which has surrendered him has been violated, or would be, by his trial; and such rights, if not asserted by the government itself, the courts are not bound to enforce at the instance of the accused, unless by express law it is made obligatory upon them to do so. And clearly, if that government would have no right to object to his surrender for the offence for which he is put on trial, or has not asserted any such right, and in delivering him up imposed no condition as to his trial for other offences, the question of good or bad faith, as we have already said, is not involved. Before the State should forego its right to try or punish for violations of its laws when the offender is found within its jurisdiction, we think there should be some very plain and positive duty in the premises. But whatever may be thought of the considerations which should influence the executive department of the State, the courts must administer the law as they find it, without regard to any supposed rights of other States not defined by law and not asserted before them by the proper authority. These views are supported by the following authorities : 2 Moore on Extradition, §§516 *et seq.*, 642–644 (ed. 1891); Rorer, Interstate Law, 227; Hawley, Interstate Extradition, 79 *et seq.*, 46 (1890); 1 Bish. Crim. Proc. §224b; People *v.* Cross (N. Y. Supreme Court and Court of Appeals), *supra;* Williams *v.* Weber, 28 Pac. Rep. 21, (Colorado, 1891); Ham *v.* State, 4 Tex. App. 645; State *v.* Stewart, 60 Wisc. 587, 50 Am. Rep. 388; *In re* Noyes (U. S. Dist. Ct. of N. J.), 17 Alb. L. J. 407.

v 90-24

It may also be worthy of note, that the policy of the
political department of this State has been to treat inter-
state rendition, not as a matter of comity or discretion,
but as an absolute duty when the Federal laws on this
subject are complied with on the part of the demand-
ing State.    See correspondence between Governor
Gordon of this State and Governor Taylor of Ten-
nessee (1889), 82 *Ga. Rep.*, Appendix 810; also corre-
spondence between Governors Schley and Gilmer of
this State and the executive of Maine (1837–1839), re-
ferred to in 2 Moore on Extradition, §563.    Governor
Gordon, in contending that the right to the rendition
of the fugitive extended to misdemeanors of every
kind, as well as to all other offences punishable by the
laws of the demanding State, whether punishable or
not at common law or by the statutes of other States,
says:    "Interstate extradition is not a matter of comity,
but of cold, hard law."    "The governor of a State  .  .
has no legal right of discretion to refuse to issue his war-
rant when a requisition is made upon him, if that
requisition is made in conformity with the law of Con-
gress."    Governor Gilmer, in one of the communications
referred to, says:    "Unless the governments of the
several States shall deliver up, upon demand, all within
their jurisdiction who are charged with the commission
of crimes in other States, with the same certainty that
criminals are arrested by the officers of justice within
the jurisdiction where their offences are committed, the
people of this country have no sufficient security for
the protection of their rights against the facility with
which offenders can escape from the jurisdiction where
alone they can be tried, and our form of government
will have failed in providing for the performance of one
of its most important functions—the certain punish-
ment of crimes."    "The arrest of fugitives from justice
can never be asked of a governor as a matter of favor,

to be granted according to his discretion. . . The demand must be made as a matter of right; and if accompanied by the proof required by the law of the United States, the duty is imperative," the proof here referred to being the authenticated copy of the affidavit or indictment in which the charge is preferred. 2 Moore, 892, citing Sen. Docs. vol. iv., 26 Cong. 1st Sess. 273.

2. It appears from the record that a prior indictment for forgery was found against the accused on the 30th of September, 1891, and that on the 5th of October, the court passed an order reciting that " the solicitor-general desiring that a *nolle prosequi* be entered on this bill for the purpose of drawing another of fuller counts, it. is therefore ordered that this bill of indictment be and the same is hereby *nol. pros'd*." On the same day another true bill for forgery was found against the defendant upon the same facts as were set forth in the former bill; and on the next day this second bill, on motion of the solicitor-general, was ordered quashed, the order reciting that it appeared to the court to be defective upon its face. Subsequently on the same day, an order was passed on the same bill, that a new bill of indictment be presented and laid before the grand jury; whereupon, on the same day, was found the indictment upon which the defendant was tried and convicted. The accused, by motion to quash and plea in abatement, objected that the entering of a *nolle prosequi* as to the indictment of September 30th was illegal, because the same was not done on account of any fatal defect therein; that there was no order directing a new bill found on the 5th of October, and therefore the bill found on that day was null and void; and that the order disposing of the bill found on that day, and the order of October 6th, directing the finding of a new bill, were improperly granted. Under the act of February 26th, 1877, entitled "An act to allow a *nolle*

*prosequi* to be entered in criminal cases with the consent
of the court," and which declares "that a *nolle prosequi*
may be entered by the solicitor-general in any criminal
case, with the consent of the court, after an examina-
tion of the case in open court" (Acts 1877, p. 108; Code,
§4649), the consent of the court is conclusive upon the
validity of a *nolle prosequi* which the court has allowed
the solicitor-general to enter before putting the accused
on trial. The latter, when arraigned upon a bill of in-
dictment subsequently found and returned by the grand
jury for the same act or offence, cannot by plea in
abatement or motion to quash, draw in question the
rightful disposition of the former bill by *nol. pros.*

3. Another objection raised by motion to quash and
plea in abatement was, that a member of the grand
jury that found the bill was related by affinity to the
prosecutor within the fourth degree, his wife being a
second cousin to the prosecutor. According to the
principle ruled in former decisions of this court, a plea
in abatement or motion to quash, based upon objec-
tions of this character, is not sustainable, at least if the
accused has had an opportunity to make the question
by challenge before the finding of the indictment. *Betts*
v. *The State,* 66 *Ga.* 508; *Williams* v. *The State,* 69 *Ga.*
12; *Lee* v. *The State, Id.* 705; *Turner* v. *The State,* 78
*Ga.* 174. In this case the accused was apprised by the
warrant for his arrest, several days before the indict-
ment was found, that the case would go before the
grand jury, and it is not shown in his plea or motion
to quash that he had no opportunity to make the objec-
tion by challenge. The case of *Reich* v. *The State,* 53
*Ga.* 73, is distinguishable from this case and the others
cited. There the grand juror was an alien, and was
therefore incompetent to serve in any case. Not being
a citizen, he lacked one of the necessary qualifications
prescribed by law. Here the grand juror, so far as

appeared, had all the legal qualifications to act gen-erally in that capacity, but was subject to objection merely because of implied bias in the particular case. Moreover, in the *Reich* case, *supra*, the charge was pre-ferred by special presentment; so there was no reason to suppose that the accused could have anticipated the action of the grand jury. The distinction between grounds of challenge *propter affectum*, or for favor, and grounds *propter defectum*, which go to the lack of ca-pacity to serve in any case, and which would render the accusation void if successfully maintained, is noted in the case of *Betts, supra*. It was there held that "it was not a good plea in abatement to an indictment, that one of the grand jurors who found it had previously been a member of the coroner's jury who sat upon the corpse and who found that the deceased had come to his death at the hands of the present defendant, and that the killing was murder." In the *Williams* case, *supra* (5 c), it was held that " if a defendant in a criminal case can except to a grand juror at all, on the ground that he has formed and expressed an opinion, it should be done be-fore the true bill is found, and not on the trial there-under. Certainly so where the defendant had notice of the pending consideration of his case by the grand jury, by reason of having been previously placed under bond." "The truth is," said JACKSON, C. J., in the opinion in that case, "it is a matter of comparatively little importance that grand jurors should not have formed opinions, because they only put the party on trial, and that after hearing only one side of the case. If, however, it is deemed important in a particular case to fight the prosecution *in limine*, diligence requires that the challenge be made before the bill is found. In this case the party could have done so." In the *Lee* case, *supra*, it was held, as in the case of *Betts*, that service by one of the grand jury upon the coroner's inquest

that found the defendant had committed the homicide
under consideration, was not a good ground for a plea
in abatement. The court said that a traverse juror
stands upon a different plane from a grand juror, in
respect to causes of challenge. "The latter, where
there is a homicide proved, only puts the presumption
of the law into the form of an accusation against the
slayer; the former tries his case, and must be without
bias or prejudice," etc. In *Turner* v. *The State, supra,*
it was held that "points relating to the number of
grand jurors and their competency should be made be-
fore the true bill is found, and not on the trial before
the traverse jury, especially where the defendant is
under a charge that apprises him that the case will go
before the grand jury, by being under bond to appear
or confined in jail to answer the offence in court." See
also *Roby* v. *The State,* 74 *Ga.* 812. The cause of dis-
qualification alleged in the present case belongs to the
same class of causes of challenge as does the fact of
service by a grand juror on a previous investigation
of the same subject-matter in controversy. 5 Bac.
Abr. 353 *et seq.* In Thompson & Merriam on Juries,
§535, it is said: "The only objections which can be
taken to grand jurors by plea in abatement must be
such as would disqualify the juror to serve in any case.
In other words, the plea must show the absence of posi-
tive qualifications demanded by law. All other objec-
tions affecting the incompetency of the juror must be
taken by challenge, if at all, and will not be heard after
the time for challenging is past. Thus, it is not a good
plea to an indictment for murder, that a member of the
grand jury which found the indictment was a nephew
of the person who was murdered." See State *v.* Easter,
30 Ohio St. 542, which was a case of this kind; also
the recent case of State *v.* Sharp, 110 N. C. 604, 14
S. E. Rep. 504, in which the son of the prosecutor was

a member of the grand jury and actively participated in the finding of the bill. Also State v. Rickey, 5 Hals. (N. J.) 83; State v. Hamlin, 47 Conn. 95, 36 Am. Rep. 54; U. S. v. White, 5 Cranch C. C. 646; U. S. v. Williams, 1 Dillon, 485 (opinion by Dillon, J.). Some of these decisions were rendered in States where there were no statutory provisions as to the challenging of grand jurors, and where it did not appear that it had been the practice to exercise this right, but the right was recognized as existing wherever the common law prevailed. See Whart. Crim. Pl. & Prac. (9 ed.), §§344 par. 4, 350; 1 Bish. Crim. Proc. (3 ed.), §§876, 878.

4. The exceptions to the overruling of the demurrer as to misjoinder of counts, and to the overruling of the motion to require the State to elect upon which of the counts it would rely, are dealt with in the 4th head-note. As to these exceptions, see: Hoskins v. State, 11 Ga. 94; Stewart v. State, 58 Ga. 580; Thomas v. State, 59 Ga. 786; Johnson v. State, 61 Ga. 213; Gilbert v. State, 65 Ga. 450; Hopkins' Penal Code, §§1514, 1515.

5. It is assigned as error that the court refused to continue the case for the term, and allowed the accused only twenty days to prepare for trial. The showing for continuance and the counter-showing are set out, in substance, in the reporter's statement. On the counter-showing, taken in connection with the showing, there was no abuse of discretion by the presiding judge in denying the application. And no error appears in admitting in evidence the facts constituting the counter-showing, most of them consisting of acts and declarations by the prisoner himself which were inconsistent with the good faith of his showing, and those which consisted of declarations by others not being separately objected to on the ground that they were hearsay.

6. The testimony ruled upon in the 6th head-note tended to illustrate the motives of the accused in the transaction in question, and was clearly admissible.

7. Several grounds of the motion for a new trial are based upon the failure and refusal of the court to charge, in effect, that if the name signed by the accused, although not his own, was one which he had been accustomed to employ and under which he had done business, the jury could not convict him. It was insisted that, in order to constitute forgery, the name must have been assumed for the sole purpose of defrauding the persons alleged to have been defrauded. We think it immaterial for what purpose the name was originally assumed and used, if it is shown that in the instance in question it was used to defraud. It was a fictitious name, within the meaning of the statute (Code, §4453), if the accused gave it a fictitious character which was calculated and intended to deceive by imparting an apparent value to the writing which might not otherwise attach to it in the minds of the persons with whom the accused was dealing. Where one has been accustomed to use a certain assumed name, it is not to be implied merely from his signing such name to a bill of exchange or other writing that the purpose is to defraud; it is not forgery unless there is something else besides the mere signing to show that the fictitious character of the name is in that instance an instrument of fraud. In the case of Dunn, 1 Leach C. C. 57, and Reg. *v.* Martin, 49 L. R., C. C., 244, cited for the plaintiff in error, there was no such showing made. In the present case, however, the accused, at the time of signing the writing, gave a fictitious character to the name, upon the faith of which he induced the parties with whom he was dealing to give value for the writing. According to his representations to them, it was the name of the son of Lord Beresford, an English nobleman of great wealth, who was about to deposit in bank $25,000 in the name of this son. When Mr. Hamilton hesitated about paying the money, the accused said:

" Our name can command any amount of money in England." He not only used an assumed name, but, in connection with the signing of the writing in question, gave a fictitious character to the name, and impersonated that character in order to obtain money upon the writing, which he might not have gotten if he had simply represented himself to be Walter S. Beresford, or had stopped with the representations he had made as to his own wealth, without making these additional representations as to his relationship and standing. The parties with whom he was dealing paid over their money to the supposed son of Lord Beresford, upon the faith of a writing executed by the accused in that character, when, as it afterwards turned out, the name used was not his own name, and Lord Beresford had no son of the name used. There being no such son, it was not a case of personating another, as contemplated by section 4596 of the code. It was the personating of a fictitious person, and this is of the essence of the offence described in the section upon which the first count of this indictment was based. Code, §4453.

8, 9. The court did not err in its instructions as to what constituted a counterfeit letter or writing, under section 4455 of the code. The evidence warranted the verdict, and there was no error in not granting a new trial on any one of the grounds contained in the motion therefor.                    *Judgment affirmed.*