(72 N. W. Rep. 901.)

---

STATE OF NORTH DAKOTA *vs.* ALLEN J. WINE.

Opinion filed October 29th, 1897.

**Embezzlement as Agent—Evidence.**

> The defendant was found guilty, under the provisions of § 7464 of the Rev. Codes, of the crime of embezzlement. The information alleges, in substance, that at the time and place stated the defendant, Joseph Miller, was the agent of one Swan Lagerberg, and that as such agent he was intrusted with the funds of said Lagerberg to the amount of $1,145, and that the defendant fraudulently appropriated said money to his own use, "not in the execution of his trust." After an examination of the evidence as set out in the opinion, *held*, that such evidence fails to establish the charge contained in the information, in this; it fails to show that the defendant, Miller, was an agent of Lagerberg when he received the money or at any time.

Appeal from District Court, Cass County; *Pollock,* J.

Allen J. Wine, informed against as Joseph Miller, was convicted of embezzlement, and appeals.

Reversed.

*Taylor Crum* and *Ida M. Crum,* for appellant.

Defendant's plea in abatement should have been sustained. It is not competent to try defendant upon a different charge from that named in the requisition upon which he was brought into the state. *State* v. *Hall*, 19 Pac. Rep. 919. No conviction for embezzlement can be had until a demand has been made for the property claimed to have been embezzled. *Peo.* v. *Tomlinson*, 5 Pac. Rep. 509. The defendant guaranteed the payment of money entrusted to him with interest. He became personally liable for the payment of the money and his failure to return it was not embezzlement. *Kribs* v. *Peo.*, 2 Am. Crim. Repts. 109. A partner cannot be held for an embezzlement of partnership funds. *State* v. *Butman*, 60 Am. Rep. 332; 1 Whart. Cr. Law, § § 1015, 1054, 922; *State* v. *Reddick*, 2 S. D. 124, 48 N. W. Rep. 846.

*F. B. Morrill, States Atty.,* and *John F. Cowan, Atty. Gen'l.,* for respondent.

A fugitive from justice extradited from another state can be tried for any offense against the laws of the state from which he fled. Subd. 2, § 2, Art. 4, Const. U. S.; *Lascelles* v. *State*, 148 U. S. 535; 37 L. Ed. 549. The jurisdiction of the court is not impaired even if the fugitive is taken by force from the state into which he has fled. *Mahon* v. *Justice*, 127 U. S. 700, 32 L. Ed. 283. No partnership was entered into between Lagerberg, Berg and Wine. There was talk of a partnership but it was never consummated. After Wine got Lagerbergs money into his possession he appropriated it to his own use and abandoned the enterprise. An executory contract to form a partnership is not a partnership. 1 Bates, 78; *Lycoming Ins. Co.* v. *Barringer*, 73 Ill. 230; *Baldwin* v. *Burrows*, 47 N. Y. 199. If the doing of certain things are conditions precedent to the existence of the partnership, the parties are not partners until they are performed. *Napoleon* v. *State*, 3 Tex. App. 522; *Metcalf* v. *Redmond*, 43 Ill. 264; *Hobart* v. *Ballard*, 31 Ia. 521; 2 Bish. Cr. L. § 345; Bates on Partnership, § 83.

WALLIN, J. The defendant is charged with the crime of embezzlement, and in January, 1897, was found guilty by a jury.

There was a motion for a new trial based upon a bill of excep-
tions embracing the evidence and the proceedings had at the trial.
Upon his arraignment (it appearing that the charge of embezzle-
ment as stated in the information was leveled against one Joseph
Miller) the defendant declared that his name was not Joseph
Miller, but Allen J. Wine.   Accordingly, all subsequent proceed-
ings in the case were had against the defendant under the name
of Allen J. Wine.   The information charged one Joseph Miller
with embezzlement, and was drawn under the provisions of § 7464
of the Rev. Codes, which reads:   "If any person being a trustee,
banker, merchant, broker, attorney, agent, assignee in trust,
receiver, executor, administrator or collector, or being otherwise
entrusted with or having in his control property for the use of
any other person, or for any public or benevolent use, fraudu-
lently appropriates it to any use or purpose not in the due and
lawful execution of his trust, or secrets it with a fraudulent intent
to appropriate it to such use or purpose, he is guilty of embezzle-
ment."   In effect, the specific charge in the information is that
defendant was the agent of one Swan Lagerberg at the time
stated, and that as such agent he was intrusted by Lagerberg
with $1,145, the property of Lagerberg, and that he feloniously
appropriated said money to his own use, and not in the due and
lawful execution of his trust.   At the trial, all the evidence, or
nearly all, converged upon the question of the defendant's
identity.   Witnesses for the state testified that the prisoner at the
bar was the identical person who, under the name of Joseph
Miller, had visited Fargo, in Cass County, in the year 1895, and
while there had entered into certain business relations and tran-
sactions touching a gold mine with divers persons, among others
with Lagerberg, as will further appear hereafter.   The defendant
produced a still larger number of witnesses, who testified that
they knew said Joseph Miller, and saw him frequently at Fargo,
in the year 1895, and also knew that the defendant on trial was
not said Joseph Miller.   In disposing of the case, however, in
this court, we shall assume that the defendant is identified as the

Joseph Miller named in the information. Identity is a question of pure fact, and, inasmuch as the jury (upon competent evidence) returned a verdict of guilty, it must be assumed in this court that the question of defendant's identity was resolved adversely to the defendant.

The testimony relied on by the state to establish the offense charged is wholly undisputed, and is, in the main, harmonious with itself. The transactions and facts constituting the offense charged, if any there is, may be condensed within a brief statement. It appears that the defendant, under the name of Joseph Miller, came to Fargo in the month of April or May, 1895, and remained there until the early part of October of that year, and then departed, and never reported his whereabouts or returned to Fargo until he was brought back in the autumn of 1896 as a prisoner charged with obtaining money under false pretenses. While at Fargo in 1895 he represented himself to be a detective in the employ of the government. He also claimed to be the owner of a stock ranch in the State of Idaho. He further stated that he knew of a very valuable gold mine located in Montana, which mine he claimed to have secured an interest in by paying down a small amount to bind a bargain for the purchase of the mine. To whom this sum was claimed to have been paid does not clearly appear. He further stated that he knew, and was particularly well acquainted with, the original owner of the mine, had befriended him, and that he was certain that he could secure the rights of such owner. Such owner was, according to Miller's statements, then a refugee from justice in Mexico, and was known to Miller, and Miller stated that he could and would find him, and obtain a transfer of his interest in the mine; and, after obtaining such interest, he claimed that the interest of other parties in the mine, who were in Montana, could also be purchased, and thereby the whole title of the mine could be secured by the purchasers. To further bolster his credit and financial responsibility, Miller exhibited a certain check, which was put in evidence, upon a bank at Cincinnati, Ohio, for a large sum. This check Miller

placed in the hands of one Mrs. Berg, the wife of a policeman at Fargo, which policeman went into the mining deal that after wards was made with Miller. This check was seen and examined by the Fargo parties, who placed money in Miller's hands in furtherance of the mining deal, and it appears clearly that the check was one considerable factor, at least, in inducing several parties to enter into the arrangement which was made with Miller concerning the Montana mine. This check was left with Mrs. Berg when Miller went away with the understanding that he was going to Mexico to secure a transfer of the owner's claim in the mine. Miller stated that he would be absent on the Mexican trip a week or ten days, and that when he returned the money could be drawn on his check. Under the arrangement Berg was was to take the check, and go to Ohio, and get it cashed, and out of the proceeds Miller himself was to invest a large amount in the mine; but it was arranged that Berg should personally go to Montana, and buy out the interests in the mine held in Montana, using Miller's funds and certain funds contributed by parties at Fargo, as hereinafter shown. Miller also claimed that he knew of two parties in South Dakota who would invest in the mine, but to what amount seems not to have been stated, nor does it appear that their names were ever given by Miller. Upon such representations it appears that several parties residing at Fargo entered into the mining scheme with the defendant as outlined above, and paid over money to him for investment in the scheme. Swan Lagerberg, who is named in the information, paid over to defendant at different times divers sums of money, amounting to the sum charged in the information, viz. $1,145. One C. L. Berg and one Edward Ness about the same time placed considerable sums of money in defendant's hands upon his promise to use the same in purchasing the mine. Lagerberg, Ness, and Berg were witnesses in the case, and, while their testimony differs slightly in some details, it is the same in all vital particulars affecting the arrangement under which the money was placed in defendant's possession. Referring to a statement made to him by Berg, who

spoke Lagerberg's language, and who made the statement at Miller's request, Lagerberg testified as follows: "He told me that he had invested money in it, and said that he had confidence in the man, and that the deal was all right, and that the mine was located in Montana somewhere. I have forgotten the name of the mountain. Miller had told him that he had been to the mountain, and found gold enough to fill his hat, but that Miller had to go to Mexico to see a man down there, and that he (Berg) should buy the mine. Q. What language was being used then? A. English. Q. What further, on that subject, did Berg state at that time? A. When they had got money enough, which should be the amount of $9,000, should be put in there by different parties, they should go out there, and buy that mine,—all of us should go out there to buy the mine. But I understood that Berg was the man who should buy it, because Miller did not dare to go there himself. Miller was to go to Mexico, and get some papers. Miller would be gone about a week or ten days. Then he would return to Fargo, and then we should all go, and follow him out there; that is, all of us who had invested money should go. This Berg told me in the barn in Miller's presence. Soon as they could raise enough money, or $9,000, all of us who had invested money should go out there; but, as I understood it, Berg should buy the mine, because Miller did not dare to go there himself. We should start out west as soon as Miller had been down to Mexico, where he was to get some papers from a man down there, about the claim. He claimed the man was a Norwegian. Miller was to be absent about a week or ten days, and would be back to Fargo, and after that we should all go and follow him out there. About eleven o'clock we left Berg's house, and started down town,—Ness, Miller, and myself,—and on the way Miller took me by the arm, and said, 'Lagerberg, are you going with us?' I said: 'I don't know yet. I don't understand this.' He says: 'Well, if you don't, you will miss it. You will find it out by and by; and if you drop this you will lose your hold of a fortune.' So I remember we parted at twelve. I heard it strike twelve down on

First avenue. I went to my room at the hotel. The next morning I went to his room, in Graham's place, in this city, and invested $25. This happened, as far as I can recollect, in the latter part of August, 1895. Before we parted that night, Miller says, 'Now, before you go in the country again, I hope you will invest some with us, so we will know you are with us.' I said—I don't know if I did at that time—I promised them when we parted that I would be at his room the next morning. About four or five days after, I went to his room, and had a talk over this business, and invested $650 with him. He wanted me to invest more, but I told him that I could invest about one thousand dollars, but I had no more money with me, but told him that I could invest about one thousand dollars. He said I could invest as much as I liked. I offered him a certified check, but he did not care to go down to the bank and draw the money, but told me to leave it with Berg. So I left the check with C. L. Berg, and had the same indorsed as if it was payable to me. The check was on the Red River Valley National Bank, of this city, and amounted to $174.39. The $25 and $650 I paid Mr. Miller in cash. Then he explained to me that there were two fellows that had promised to go along that had sent word that they could not, because they could not get their money, and he wanted me to invest more, and he said: "If you invest with me $1,500, I will promise you $35,000 inside of a year.' It was on the occasion that I paid him the $650 that he told me the two men that he had expected were not going in. I went then to St. Paul, and drew some money, as I did not have any more here, and was absent about three days; and when I returned I invested with him $150 more, and the next day again I invested $46. A day or two afterwards I placed in his hands $100. This was on the 4th of October. He told me then to come back to his room about 8 o'clock in the evening, and he would make the contract and note on the money I invested, as he was going immediately to Mexico, so I could not see him then for about six or ten days. He wanted me to raise more money, but I said I could not. He then put the figures on a piece of

paper, and put it into his vest pocket. Then he said, when he got back from Mexico, Berg was going to Cincinnati to draw $7,000, and if I would like to take a trip along with Berg I might do so, and that it should not cost me anything, as he would stand the expenses. Then we parted, and I did not see him again until the fall or winter of 1896, here in Fargo, down to the justice office, at the time of the preliminary hearing of this case. I might also state that I went to his room at 8 o'clock that evening when I paid him the last $100, but he was not there. The room was empty, and his trunk was taken out also. The reason he gave me for going to the room again that night was that he was to give me a contract or note showing the amout of money I had put into the investment. I asked him for a note or contract, so I would know where I would be. 'That is all right,' he says, 'and I will make it out for you this evening.' He told me to come at eight o'clock. I never received any memorandum of any kind whatever for that money I invested, and received no message or communication from him whatever." Cross-examination by Mr. Crum: "I invested money with Miller in the mining deal, but I do not know anything about Berg and Ness. Berg said he had invested money in it, but I did not see it, nor did I see Ness invest any. Miller claimed he was going to invest the $7,000 from Cincinnati. The way I understood it, was that the $7,000 of Miller, and what money I put in, and what Berg and Ness put in, should go to this mine, and for mining stock. I don't know whether the profits of this mining business should be divided between me, Berg, Ness, and Miller; only he offered me if I would put in $1,500, $35.000, or else I could have $3.50 back for every dollar I put in; that was the only profit I should have. I don't know what profit Berg and Ness should have, only what he offered me himself. I don't remember if I ever asked Miller to give me back my money. He left that night before he drew up the contract. When we were talking about it, it was promised I should have the money back on a fair deal. There was a check left with Mrs. Berg as security for this money, and for the faithful

performance by Miller of his part of the contract,—that he would do as he agreed. I believed Miller when he told me that my share of the profit would be $3.50 on every dollar, and I relied on that promise. I did not exactly rely upon the security of the check, but asked Berg about it,—if he had found out about the check. But at the time I paid the money I relied on the security of the check. I asked Berg about it, and he said it was good, and I believed what Berg said." Upon this state of facts, based upon the undisputed evidence in the case, the question arises whether the evidence in its entirety establishes the criminal charge contained in the information. The District Court charged the jury, in effect, that, if the arrangement made between Lagerberg and the defendant was a co-partnership arrangement, the verdict must be "not guilty," and in this connection the statutory definition of a co-partnership was read to the jury; but the jury were not instructed in terms that the arrangement was a co-partnership. That question was left to be determined as a question of fact. It was clearly correct to instruct the jury that, if the relation created by the arrangement made between the defendant and Lagerberg was that of a co-partnership, the defendant must be acquitted. This is sound for a double reason: First, the statute defining embezzlement does not include partners as persons who can commit the offense charged, and it is well settled that, in the absence of statutory provisions to that effect, a partner cannot commit the offense of embezzling property belonging to the firm. Again, the instruction was correct because the defendant was not charged in the information either with receiving partnership property in trust or with being a partner at the time he received the money. The offense charged is purely statutory in its origin, and the statute was originally passed in England to supplement the law of larceny by punishing those who, in a trust capacity, like that of clerks, agents, and servants, came into the possession of property belonging to their employers, and thereafter, without a felonious taking, fraudulently appropriated it or its proceeds to their own use. The information in this

case in express terms charges that the defendant was the agent of Lagerberg when the latter intrusted him with his money, and that defendant received the money in his capacity of agent, and that the defendant appropriated the money fraudulently, "and not in the due and lawful execution of his trust"; *i. e.* his trust as an agent. To sustain the charge made in the information, and make out the offense under the section of the statute upon which the charge is based, the averments in the information must be sustained by the evidence. The decisive question is whether the evidence shows that at the time the money was placed in Miller's hands he (Miller) was the agent of Lagerberg, and acted as such in taking the money under the arrangement made between them at that time. Defendant's counsel contends that the evidence clearly establishes the relation of partners, and that the transactions show a joint venture as co-partners in a mining scheme or enterprise. Counsel for the state opposes this view of the evidence, and insists that the arrangement was merely preliminary to the formation of a parnership which was never completed, and never culminated in a co-partnership as a fact. We quote from the brief of respondent's counsel: "The partnership was to be consummated after Miller returned from Mexico. Then the money in Cincinnati, which Miller claimed belonged to him, was to be drawn, and they were all going west, and the partnership talked of was to be carried out and the mine purchased. Lagerberg's money was simply placed in Miller's hands in trust until these arrangements could be carried out. Miller was Lagerberg's agent up to the time that Miller left with Lagerberg's money. Miller had not advanced one cent in the enterprise. His money was to be put in after his return from Mexico, and his money drawn from Cincinnati, where he claimed it was then on deposit. In the meantime the two men from South Dakota were to come in; and not until all this was done was the partnership which had been talked of to go into effect and have an existence. Miller did nothing in the performance of the conditional agreement between the parties." In support of this contention counsel

cites, among other authorities, 1 Bates, Partn. § 78, which reads: "An executory contract to form a partnership is not a partnership, though it may ripen into one by being what is commonly called 'launched'; that is, by carrying the agreement into effect, and engaging in the joint undertaking. But the effect and the agreement itself are two different things." Also: "A mere intention to form a partnership does not constitute one until an actual agreement is made." *Id.* § 79. Tested by the law as stated above, it is certainly quite clear that the proposed co-partnership, if such it was, never was "launched"; that is, it never culminated as a business concern. Assuming that the evidence shows that the defendant fraudulently appropriated the money placed in his possession by Lagerberg, and never bought the mine, the business contemplated by the arrangement between the parties had no basis of operations, and therefore was not, and could not be, "launched" as a co-partnership business. We are inclined to the view, however, and shall so rule, that the arrangement made between Lagerberg and the defendant should be classed as an executory agreement to enter into a partnership in a mining scheme, whereby a gold mine was to be bought and exploited. We think the arrangement may fairly be tested by an inquiry as to what would have been the legal status, or rather the relation, of the parties, if the arrangement agreed upon had been consummated by the purchase of the mine, and followed by going to Montana, and taking possession of it, as it was agreed should be done. Had such purchase been actually made, and been followed by entering into possession of the mine, there can be no doubt whatever that all persons who had invested their funds under the arrangement shown in this case would have sustained the relation of partners with reference to such property, and with reference to each other. It will not do to argue that, because the agreement was violated by Miller, and hence that the co-partnership never materialized as a fact, no agreement to enter into a co-partnership was ever made. The fundamental question in the case is this: What, under the arrangement, was the relation sus-

tained between Largerberg and the defendant when the former placed the money in the defendant's possession, to be invested in the mining property? Was there an agency existing at that time? Was the money intrusted to the defendant to be paid out by the latter for the exclusive benefit of Lagerberg, or for the benefit of Lagerberg and the others at Fargo, who had also put their money in the defendant's hands? Under the evidence, these questions must all receive a negative answer. The evidence is clear and conclusive that it was agreed that the fund put into defendant's hands by Lagerberg and others at Fargo was to be augmented by the addition of a much larger sum, to be contributed out of the defendant's funds derived from the proceeds of a check belonging to the defendant; and that the mine was to be purchased out of the joint fund so obtained. Under this arrangement the defendant would have been the larger owner of the mine, and the evidence in the case shows that such was the expectation of the parties concerned. In fact, Miller claimed that he had secured the right to purchase the mine before coming to Fargo, and held the right while negotiating with the others interested. Under these circumstances it would be manifestly unwarranted to say that the defendant acted as the agent of Lagerberg in the premises. He was in a position to dictate terms according to the scheme as unfolded by him to the others, and with reference to which the money was paid over to the defendant. In brief, we are entirely satisfied that no agency was shown by the evidence, and this must reverse the case. We might add, however, that some of the evidence indicates that Lagerberg relied chiefly upon the personal promise given by the defendant to pay him back $3.50 for each dollar invested by him if Lagerberg became dissatisfied with the venture, and desired to withdraw from it. Under this aspect of the evidence, there certainly was no agency in the case, even if there was no agreement to form a co-partnership. It would be simply a loan by Lagerberg upon the defendant's personal promise to repay the principal with a large bonus or profit, re-enforced, perhaps, by the check left in Fargo as an

"evidence of good faith."   But, as we have said, we are inclined
to class the agreement as an executory agreement to enter into a
co-partnership.

There are numerous assignments of error upon the record based
upon the proceedings had at the trial, but in view of the grounds
upon which the case is reversed, there cannot be another trial upon
the information charging embezzlement, and hence such rulings
below as are assigned as error are not likely to again occur in this
case, and therefore the assignments need not be further considered.
To this, however, there may possibly be one exception:   If
defendant is informed against for some other offense, it may
become necessary to determine whether he can or should be
tried in this state for any offense other than that of "obtaining
money under false pretenses," which was the offense named in the
requisition of the governor upon which he was arrested and
brought here from the State of Missouri.   The case cited by
defendant's counsel (*State* v. *Hall*, [Kan. Sup.] 19 Pac. Rep. 919)
animadverts upon the act of trying a person after rendition from
a sister state, upon a particular charge, for another crime; but no
court has claimed that the courts of the state where the offense
was committed are ousted of their jurisdiction to try the offender
for any offense committed in the state where the trial is had,
whether such offense was or was not named in the requisition
papers.   The utmost claimed in the Kansas case is that a trial
upon a charge not mentioned in the requisition would be an act
of perfidy, and grossly discourteous to the state whose governor
honored the requisition.   The cases cited below are clear that the
point cannot be urged by a defendant in bar of a prosecution for
any crime against the laws of the state where he is tried.   This
defense is not available even to a defendant who has been kid-
napped by an armed force, and forcibly taken from another state,
and brought to the state where he is tried.   The question is of
some delicacy, as it involves the rghts of the states under the
federal constitution, and also the comity between states.   In cases
of this character we are disposed to give the greatest weight to

the decisions of the Supreme Court of the United States, and upon the authority of the cases cited below we shall overrule the defendant's contention. *Lascelles* v. *Georgia*, 148 U. S. 537, 13 Sup. Ct. Rep. 687; *Mahon* v. *Justice*, 127 U. S. 700, 8 Sup. Ct. Rep. 1204.

The judgment and sentence of the District Court are reversed. All the judges concurring.