*In re* JOHN A. FLACK, *Petitioner.*

No. 18,456.

SYLLABUS BY THE COURT.

1. FUGITIVE FROM JUSTICE—*Interstate Rendition—Prosecution for Other Crimes.* A person charged in any state with treason, felony, or other crime, who shall flee from justice and be found in another state, and who, on the demand of the executive authority of the state from which he fled, shall be delivered up and removed to the state having jurisdiction of the crime, may there be prosecuted for crimes other than the one specified in the demand for his delivery without first giving him a reasonable opportunity to return to the state which surrendered him.

2. ———— *Same.* The case of *The State v. Hall*, 40 Kan. 338, 19 Pac. 918, is overruled.

Original proceeding in habeas corpus. Opinion filed January 11, 1913. Petitioner remanded.

*C. S. Crawford,* of Abilene, for the petitioner.

*John S. Dawson,* attorney-general, for the state.

The opinion of the court was delivered by

BURCH, J.: The petitioner, John A. Flack, was cashier of the Abilene State Bank. On or about September 1, 1910, he absconded. Soon afterwards a complaint was filed before a justice of the peace of Dickinson

*In re* Flack.

county charging him with forging the name of James. A. Strachan to a note for two thousand dollars with intent to defraud Strachan and the Abilene State Bank. A warrant of arrest was issued and placed in the hands of the sheriff for service. In August, 1912, Flack was discovered in the state of New York and was arrested there upon a fugitive warrant and held pending further rendition proceedings. Such proceedings followed, resulting in his return to Dickinson county for trial upon the forgery charge. A preliminary examination was waived and he gave bond for his appearance at the ensuing term of the district court. While awaiting trial eleven other prosecutions were instituted against him for false and fraudulent alterations of entries upon the books of the bank. Motions to quash the informations in these cases and to stay proceedings in them until after the original case should be disposed of were overruled, and in default of bail he was committed to the county jail. This proceeding is brought to discharge him from custody in the eleven cases instituted against him for crimes not embraced in the rendition proceedings.

The question involved is not new and has provoked great argument about and about. It has been decided favorably to the petitioner by this court in the case of *The State v. Hall*, 40 Kan. 338, 19 Pac. 918. The syllabus of that case reads as follows:

"An alleged fugitive from justice, extradited from one state to another, can be prosecuted in the state to which he has been extradited, only for the offense for which he was extradited, until after he has had a reasonable time and opportunity afforded him to return to the place from which he was extradited."

Similar views have been expressed by the supreme court of Ohio. (*Ex parte, McKnight*, 48 Ohio St. 588, 28 N. E. 1034.) The courts of other states which have considered the question and the supreme court of the United States hold to the contrary. (*Carr v. The State,*

104 Ala. 43, 16 South. 155; *Williams v. Weber,* 1 Colo. App. 191, 28 Pac. 21; *Lascelles v. The State,* 90 Ga. 347, 16 S. E. 945; *Knox v. State,* 164 Ind. 226, 73 N. E. 255; *State v. Kealy,* 89 Iowa, 94, 56 N. W. 283; *Taylor v. Commonwealth,* [Ky. 1906] 96 S. W. 440; *Commonwealth v. Wright,* 158 Mass. 149, 33 N. E. 517; *In re Little,* 129 Mich. 454, 89 N. W. 38; *State v. Patterson,* 116 Mo. 505, 22 S. W. 696; *State v. Leidigh,* 47 Neb. 126, 66 N. W. 308; *Rutledge v. Krauss,* 73 N. J. Law, 397, 63 Atl. 988; *People, ex rel. Post, v. Cross,* 135 N. Y. 536, 32 N. E. 246; *State v. Glover,* 112 N. C. 896, 17 S. E. 525; *State v. Wine,* 7 N. Dak. 18, 30, 72 N. W. 905; *Dows' Case,* 18 Pa. St. 37; *Ham v. The State,* 4 Tex. App. 645; *The State, ex rel. Brown, v. Stewart, Circuit Judge, etc.,* 60 Wis. 587, 19 N. W. 429; *Lascelles v. Georgia,* 148 U. S. 537.)

Text-writers are divided in opinion. Spear on The Law of Extradition (2d ed., ch. 12) favors the rule stated in the syllabus of Hall's case. The following authorities take the opposite view: 2 Moore on Extradition, ch. VIII; Hawley, Interstate Rendition, p. 78 *et seq.;* Rorer on Interstate Law, p. 307; 2 Wharton on The Conflict of Laws, 3d ed., p. 1696; 1 Bishop's Criminal Procedure, § 224*b.*

The written law on the subject is contained in the constitution of the United States and an act of Congress passed pursuant thereto. The constitution reads as follows:

"A person charged in any state with treason, felony, or other crime, who shall flee from justice, and be found in another state, shall on demand of the executive authority of the state from which he fled, be delivered up to be removed to the state having jurisdiction of the crime." (Art 4, § 2.)

In the constitutional convention this provision first appeared in the report of the committee of detail as follows:

"Any person charged with treason, felony or high

*In re* Flack.

misdemeanor in any State, who shall flee from justice, and shall be found in any other State, shall, on demand of the Executive power of the State from which he fled, be delivered up and removed to the State having jurisdiction of the offence." (3 Documentary History of the Constitution, p. 456.)

Afterwards the words "high misdemeanor" were stricken out and the words "other crime" were inserted in order to comprehend all proper cases, it being considered doubtful whether the term "high misdemeanor" did not have a technical meaning too limited. (Id. p. 634.) The section was given its final form by the committee of "Stile & arrangement."

The act of Congress referred to reads as follows:

"Whenever the executive authority of any State or Territory demands any person as a fugitive from justice, of the executive authority of any State or Territory to which such person has fled, and produces a copy of an indictment found or an affidavit made before a magistrate of any State or Territory, charging the person demanded with having committed treason, felony, or other crime, certified as authentic by the governor or chief magistrate of the State or Territory from whence the person so charged has fled, it shall be the duty of the executive authority of the State or Territory to which such person has fled to cause him to be arrested and secured, and to cause notice of the arrest to be given to the executive authority making such demand, or to the agent of such authority appointed to receive the fugitive, and to cause the fugitive to be delivered to such agent when he shall appear. If no such agent appears within six months from the time of the arrest, the prisoner may be discharged. All costs or expenses incurred in the apprehending, securing and transmitting such fugitive to the State or Territory making such demand, shall be paid by such State or Territory.

"Any agent so appointed who receives the fugitive into his custody, shall be empowered to transport him to the state or territory from which he has fled. And every person who, by force, sets at liberty or rescues the fugitive from such agent while so transporting him, shall be fined not more than five hundred dollars

or imprisoned not more than one year." (U. S. Rev. Stat., §§ 5278, 5279.)

The primary question for consideration is, of course, the meaning of the constitution of the United States, of which the supreme court of the United States is the final interpreter.

When this court approached the subject in Hall's case the supreme court of the United States had not spoken upon the precise question under consideration. Among other eminent authorities, Judge Cooley (Princeton Review, Jan., 1879, p. 76) and Doctor Spear (The Law of Extradition, 2d ed., ch. 12) had expressed opinions to the effect that in cases of interstate rendition it would be a violation of the constitution to put the fugitive on trial for any other offense than the one specified in the rendition proceedings without first giving him an opportunity to depart from the jurisdiction to which he had been returned. These opinions coincided with the right of asylum as understood in international law, with the practice of independent sovereignties in extradition cases under treaties and with the rules of the common law exempting suitors and witnesses from abuse of judicial process. Reasoning by analogy, the court reached the conclusion that the principles governing extradition between independent sovereignties under treaties and rendition between separate states under the constitution of the United States were the same. This conclusion accorded with that of some other courts and was believed to be fortified by the then very recent decision of the supreme court of the United States in the case of *United States v. Rauscher*, 119 U. S. 407.

The Rauscher case arose under the Webster-Ashburton treaty with Great Britain, the preamble of which, so far as pertinent, reads as follows:

"And whereas it is found expedient for the better administration of justice and the prevention of crime within the territories and jurisdiction of the two Par--

ties, respectively, that persons committing the crimes hereinafter enumerated, and being fugitives from justice, should, under certain circumstances, be reciprocally delivered up: The United States of America and Her Britannic Majesty, having resolved to treat on these several subjects, have for that purpose appointed their respective Plenipotentiaries to negotiate and conclude a treaty." (Compilation of Treaties Under Act of 1898, p. 226.)

Article 10 specified seven extraditable offenses and reads as follows:

"It is agreed that the United States and Her Britannic Majesty shall, upon mutual requisitions by them, or their Ministers, Officers, or Authorities, respectively made, deliver up to justice, all persons who, being charged with the crime of Murder, or assault with intent to commit Murder, or Piracy, or Arson, or robbery, or forgery, or the utterance of forged paper, committed within the jurisdiction of either, shall seek an asylum, or shall be found, within the territories of the other: Provided, that this shall only be done upon such evidence of criminality as, according to the laws of the place where the fugitive or person so charged, shall be found, would justify his apprehension and commitment for trial, if the crime or offence had there been committed: And the respective Judges and other Magistrates of the two Governments shall have power, jurisdiction, and authority, upon complaint made under oath, to issue a warrant for the apprehension of the fugitive or person so charged, that he may be brought before such Judges or other Magistrates, respectively, to the end that the evidence of criminality may be heard and considered: and if, on such hearing, the evidence be deemed sufficient to sustain the charge it shall be the duty of the examining Judge or Magistrate to certify the same to the proper Executive Authority, that a warrant may issue for the surrender of such fugitive.—The expense of such apprehension and delivery shall be borne and defrayed by the Party who makes the requisition, and receives the fugitive." (Compilation of Treaties Under Act of 1898, p. 230.)

Rauscher was extradited for murder. He was not tried for murder, however, but for a minor offense not

embraced in the treaty. On a motion in arrest of judgment the judges of the circuit court in which the action was pending divided in opinion, and the matter was presented to the supreme court of the United States on their certificate. The principal question was the true import of the treaty. The recognized public law on the subject prevailing in the absence of treaties was examined and stated. The provisions of the treaty itself were analyzed and considered according to the approved canons of interpretation, and the interpretation placed upon all treaties of this character by congress in the extradition act was adverted to. The conclusion was that, although the treaty contained no express limitations upon the right of the country in which the crime was committed to try the fugitive for that crime alone for which he was extradited, nevertheless, sound construction rendered an implication of such a limitation unavoidable; that under the treaty and the act of congress Rauscher could not lawfully be tried for any crime but murder; that he was clothed with the right to exemption from trial for any other offense until he had an opportunity to return to the country from which he was taken for the purpose alone of trial for the offense specified in the demand for his surrender; and that the national honor required that good faith should be kept with the country which surrendered him.

This decision is manifestly sound. Every independent nation has the right to grant an asylum to a person residing peacefully within its borders, even though he be an offender against the law of some foreign state, and this right supersedes the right of the foreign state to demand that he be given up for trial. However desirable it may be that fugitives from justice should be surrendered to answer for their misdeeds, no obligation to do so rests upon the asylum state, which has the right to make the peace and security of any person re-

siding upon its territory its own cause. It may relinquish this right either by comity or by agreement, but any concession it may make does not waive the right generally. If the relinquishment be made by treaty the asylum is abridged only with respect to the crimes specified in the treaty, and then only subject to the limited forms of procedure agreed upon. These considerations are fundamental in the interpretation of any extradition treaty, and their importance is emphasized when attention is drawn to political offenses. Such crimes being directed against the political system of the state, or its administrators, do not of necessity render those who commit them undesirable citizens of another state. What would be called treason in the parent country might be regarded as a legitimate struggle for liberty by another country, which, on the highest principles of justice and humanity, would be authorized to afford refuge to exiled participants in such a struggle. Consequently, political crimes are not considered extraditable, and it would offend against the law of nations if a fugitive were extradited for a crime specified in a treaty and then were put on trial for a political offense. Turning to the treaty in question, it waives the right to afford asylum to fugitive offenders with respect to seven designated crimes only; and the sovereignty upon which the demand for surrender is made expressly reserves the right to examine the case presented by the requisition, hear the evidence of criminality, and determine whether or not the offense charged justifies the government in depriving the accused of his asylum. These facts in themselves are quite conclusive that as to all other offenses the fugitive, if surrendered, is to be regarded as still in the asylum state. The extradition act (U. S. Rev. Stat. Title LXVI) provides for a hearing, upon complaint made under oath, to determine whether the evidence is sufficient to sustain the charge of criminality before a

warrant may issue for the surrender of a fugitive whose return is desired by a foreign nation.   (§ 5270.) It further provides that the secretary of state is authorized to order a person demanded of the United States to be committed to be delivered up "to be tried for the crime of which such person shall be so accused" (§ 5272) ; and that a person delivered up to the United States for trial shall have protection and safe-keeping "until the final conclusion of his trial for the crime or offence specified in the warrant of extradition, and until a final discharge from custody or imprisonment for or on account of such crimes or offences, and for a reasonable time thereafter." (§ 5275.)   Under these circumstances it would have violated the convention between the two governments and would have compromised the national honor if the United States had suffered Rauscher to be tried, not only for an offense not named in the requisition, but for an offense not specified in the treaty itself.

In Hall's case the court applied the arguments whereby the interpretation of the Webster-Ashburton treaty was sustained to an interpretation of the constitution of the United States.   The states of the Union were treated like independent sovereignties having the right to grant asylum to fugitives from justice who could not be surrendered without the consent of the asylum state.   The constitution was regarded in the light of an extradition treaty between such sovereignties, and it was declared that the Rauscher case, among others of like import, which were cited, was perfectly applicable to the one under decision.

On the same day that the opinion in the Rauscher case was filed a decision was rendered by the supreme court of the United States in the case of *Ker v. Illinois,* 119 U. S. 436, which greatly impaired the basis upon which the constitutional argument in Hall's case was founded.   Ker was kidnapped from Peru, with which country the United States had an extradition treaty,

and brought to the state of Illinois for trial for embezzlement and larceny.  He was convicted, and the case was taken by writ of error to the supreme court of the United States, where he claimed that the full faith and credit of the treaty with Peru had not been kept and enforced.  He contended that under the treaty he had acquired by his residence in Peru a right of asylum; a right to be free from molestation for the crime committed in Illinois; a right that he should be forcibly removed from Peru to the state of Illinois only in accordance with the provisions of the treaty; and that this right was one which he could assert in the courts of this country.  The court said:

"There is no language in this treaty, or in any other treaty made by this country on the subject of extradition, of which we are aware, which says in terms that a party fleeing from the United States to escape punishment for crime becomes thereby entitled to an asylum in the country to which he has fled; indeed, the absurdity of such a proposition would at once prevent the making of a treaty of that kind.  It will not be for a moment contended that the government of Peru could not have ordered Ker out of the country on his arrival, or at any period of his residence there.  If this could be done, what becomes of his right of asylum.

"Nor can it be doubted that the government of Peru could of its own accord, without any demand from the United States, have surrendered Ker to an agent of the state of Illinois, and that such surrender would have been valid within the dominions of Peru.  It is idle, therefore, to claim that, either by express terms or by implication, there is given to a fugitive from justice in one of these countries any right to remain and reside in the other; and if the right of asylum means anything, it must mean this.  The right of the government of Peru voluntarily to give a party in Ker's condition an asylum in that country, is quite a different thing from the right in him to demand and insist upon security in such an asylum."  (p. 442.)

Consequently, it was held that Ker was clothed with no rights which a proceeding under a treaty would have

protected, and the judgment of conviction was not disturbed.

In 1887 the rule stated in Ker's case was applied to a case of kidnapping from one state to another. (*Mahon v. Justice,* 127 U. S. 700.) Mahon was indicted for murder committed in Kentucky. He fled to West Virginia. He was then forcibly abducted to Kentucky, where he was committed for trial upon the indictment. It was held that he was not entitled to be discharged under a writ of habeas corpus. The court said:

"There is indeed an entire concurrence of opinion as to the ground upon which a release of the appellant in the present case is asked; namely, that his forcible abduction from another State, and conveyance within the jurisdiction of the court holding him, is no objection to his detention and trial for the offence charged. They all proceed upon the obvious ground that the offender against the law of the State is not relieved from liability because of personal injuries received from private parties, or because of indignities committed against another State. It would indeed be a strange conclusion, if a party charged with a criminal offence could be excused from answering to the government whose laws he had violated because other parties had done violence to him, and also committed an offence against the laws of another State. . . . It is contended that, because under the Constitution and laws of the United States a fugitive from justice from one State to another can be surrendered to the State where the crime was committed, upon proper proceedings taken, he has the right of asylum in the State to which he has fled, unless removed in conformity with such proceedings, and that this right can be enforced in the courts of the United States. But the plain answer to this contention is, that the laws of the United States do not recognize any such right of asylum, as is here claimed, on the part of a fugitive from justice in any state to which he has fled." (pp. 712, 714.)

The principle that a fugitive from justice does not bear in his own person the sovereignty of the state to which he has fled, and that if any one is within the juris-

*In re* Flack.

diction of a court and there properly charged with crime, the court may hold him and proceed to try him without reference to the circumstances under which he was brought within its jurisdiction, was clearly and forcibly stated by Chief Justice Gibson in *Dows' Case*, 18 Pa. St. 37, decided in 1851. After having been indicted for forgery in Pennsylvania, Dows escaped to the state of Michigan. Without legal authority he was returned to Pennsylvania. Pursuant to a requisition made upon him the executive of Michigan issued a warrant to arrest and surrender Dows, but it was not utilized. The opinion reads:

"The governor of Michigan, so far from resenting the prisoner's arrest, had put a warrant for his extradition into the hands of the proper officer. The sovereignty of the state, therefore, was not outraged, unless it resided in the prisoner's person. A sovereign state is doubtless bound to fight the battle of its citizen, when he has his quarrel just; but it is not bound to maintain him against demands of foreign justice from which he has fled. It may, or it may not, interpose its shield at discretion; but the exercise of this discretion will be directed, not by any claim he may be supposed to have on it, but by a consideration of the consequences to the general weal. The federal constitution takes away this discretion in the case of an executive demand, and makes that a matter of duty which else had been a matter of grace; but it does not prevent a state from dispensing with a demand. The constitutional provision was not devised for the benefit of the fugitive. It was intended to obviate the principle that one government may not execute the criminal laws of another." (p. 39.)

In the case of *Mahon v. Justice*, 127 U. S. 700, the governor of West Virginia demanded the restoration of the prisoner to the jurisdiction of that state, but that fact afforded him no immunity from trial upon the indictment found in the state of Kentucky.

The effect of these decisions is that the so-called right of asylum is not a right possessed by a fugitive from justice in any case; that it is merely the right of an

independent sovereignty to grant asylum if it so desires, and that a state of the United States possesses no such right respecting fugitives from the justice of another state.

In 1892 the precise question involved in the present proceeding was decided by the supreme court of Georgia in the case of *Lascelles v. The State*, 90 Ga. 347, 16 S. E. 945. Lascelles was extradited from New York for one crime and placed on trial in Georgia for another. By a motion to quash the indictment and a plea in abatement, he contended that it was unlawful to try him without first allowing him to return to the state which surrendered him. The court held that his objections were properly overruled. A very able opinion was delivered by Mr. Justice Lumpkin, who, after discussing the Rauscher case and the treaty and act of Congress which it involved, said:

"When we go back of the express law on the subject, and consider the matter independently of the statute referred to or of the obligations assumed by treaty, it will be found that the right of the person extradited to return to the country from which he was surrendered, is based upon the right of that country to afford asylum to the fugitive, and to refuse to give him over to another except upon such terms as it may see fit to impose. It is well settled that the criminal himself never acquires a personal right of asylum or refuge anywhere. Such right as he may have in this respect grows entirely out of the rights of the government to whose territory he has fled. It matters not, so far as the right to try him is concerned, that he may have been abducted while in another State, and brought back illegally and against his will to the State whose criminal laws he has violated, nor, in such case, that the executive of the State from which he was taken has demanded his return. (*Mahon v. Justice*, 127 U. S. 700. See also *Ker v. Illinois*, 119 U. S. 436, decided on the same day as the Rauscher case, *supra*.) That the right to protect the fugitive who has taken refuge in its territory exists on the part of every independent nation, except in so far as it may have agreed to forego the right, is recognized by the Supreme Court of the

United States in the Rauscher case, as an established principle of international law. But to our minds it is clear that under the organic law of the Union no such right exists on the part of the several States with reference to each other. The constitution declares that 'a person charged in any State with treason, felony or other crime, who shall flee from justice, and be found in another State, shall, on demand of the executive authority of the State from which he fled, be delivered up, to be removed to the State having jurisdiction of the crime.' (Art. 4, sec. 2, subsec. 2.) And it is settled that this provision extends without exception to all offences punishable by the laws of the State where the act was done. It is immaterial that the thing complained of is not a crime in the State in which the accused is found; nor can the authorities of that State inquire into the question of his guilt or innocence. The sole question is, whether he is a fugitive charged with crime under the laws of the demanding State. If he is, the duty to deliver him up is imperative. The framers of the organic law clearly intended that there should be no reserved right to convert any State into a place of refuge for fugitives from the justice of another, and that State lines should constitute no insuperable obstacle to the enforcement of the criminal laws of any part of the Union, as to offences committed within the field of their operation. By the act of 1793, Congress has constituted the executive authority of the State to which the accused has fled the agency for carrying into effect the provisions of the Federal constitution and laws as to arrest and delivery. His sole function is to ascertain whether the authorities of the demanding State have on their part complied with the constitutional and statutory requirements, and, if so, to cause the arrest and delivery of the fugitive. If these requirements are complied with, he has no further interest in the matter and cannot set up any right of his State to protect the fugitive. The sole right which his State can set up as against the right of the demanding State is, that its own justice shall be satisfied if at the time of the demand the accused stands charged with a violation of its laws. In such cases the right of the demanding State is not denied, but is merely suspended until a prior claim shall have been discharged. . . . . It may be true that there is no power on the part of the Federal government or of the demanding

State to compel performance of this duty, but it is not on that account in any less degree a duty.

"If, therefore, the demand can not, as a matter of right, be refused when made in compliance with the Federal requirements, it would be idle for the authorities of the State to whom the accused was surrendered to set him at large so that another demand might be made, before trying him for an offence other than that charged in the requisition upon which he was surrendered. Certainly they are under no obligation, before trying him for other violations of law, to place the executive of the surrendering State in a position to do or refuse to do that which, under the supreme law of the land, it is his imperative duty to do.

"If what we have said is true, considerations of comity and good faith on the part of the State to which the surrender was made are not involved in the matter." (pp. 363, 366.)

Lascelles removed the controversy to the supreme court of the United States, which approved the opinion of Justice Lumpkin and affirmed the judgment of the supreme court of Georgia. The opinion, written by Mr. Justice Jackson, contained the greatly desired interpretation of the constitution of the United States and of the extradition act, so far as it relates to interstate rendition. The material portions follow:

"Upon these provisions of the organic and statutory law of the United States rests exclusively the right of one State to demand, and the obligation of the other State upon which the demand is made to surrender, a fugitive from justice. Now, the proposition advanced on behalf of the plaintiff in error in support of the federal right claimed to have been denied him is, that, inasmuch as interstate rendition can only be effected when the person demanded as a fugitive from justice is duly charged with some particular offence, or offences, his surrender upon such demand carries with it the implied condition that he is to be tried *alone* for the designated crime, and that in respect to all offences other than those specified in the demand for his surrender, he has the same right of exemption as a fugitive from justice extradited from a foreign nation. This proposition assumes, as is broadly claimed, that the

States of the Union are independent governments, having the full prerogatives and powers of nations, except what have been conferred upon the general government, and not only have the right to grant, but do, in fact, afford to all persons within their boundaries an asylum as broad and secure as that which independent nations extend over their citizens and inhabitants. Having reached, upon this assumption or by this process of reasoning, the conclusion that the same rule should be recognized and applied in interstate rendition as in foreign extradition of fugitives from justice, the decision of this court in *United States v. Rauscher,* 119 U. S. 407 *et seq.,* is invoked as a controlling authority on the question under consideration.   If the premises on which this argument is based were sound the conclusion might be correct.   But the fallacy of the argument lies in the assumption that the States of the Union occupy towards each other, in respect to fugitives from justice, the relation of foreign nations, in the same sense in which the general government stands towards independent sovereignties on that subject; and in the further assumption that a fugitive from justice acquires in the State to which he may flee some state or personal right of protection, improperly called a right of asylum, which secures to him exemption from trial and punishment for a crime committed in another State, unless such crime is made the special object or ground of his rendition.   This latter position is only a restatement, in another form, of the question presented for our determination.   The sole object of the provision of the Constitution and the act of Congress to carry it into effect is to secure the surrender of persons accused of crime, who have fled from the justice of a State, whose laws they are charged with violating.   Neither the Constitution, nor the act of Congress providing for the rendition of fugitives upon proper requisition being made, confers, either expressly or by implication, any right or privilege upon such fugitives under and by virtue of which they can assert, in the State to which they are returned, exemption from trial for any criminal act done therein.   No purpose or intention is manifested to afford them any immunity or protection from trial and punishment for any offences committed in the State from which they flee.   On the contrary, the provision of both the Constitution and the statues ex-

tends to *all* crimes and offences punishable by the laws of the State where the act is done. *Kentucky v. Dennison,* 24 How. 66, 101, 102; *Ex parte Reggel,* 114 U. S. 642.

"The case of *United States v. Rauscher,* 119 U. S. 407, has no application to the question under consideration, because it proceeded upon the ground of a right given impliedly by the terms of a *treaty* between the United States and Great Britain, as well as expressly by the acts of Congress in the case of a fugitive surrendered to the United States by a foreign nation. That treaty, which specified the offences that were extraditable, and the statutes of the United States passed to carry it and other like treaties into effect, constituted the supreme law of the land, and were construed to exempt the extradited fugitive from trial for any other offence than that mentioned in the demand for his surrender. There is nothing in the Constitution or statutes of the United States in reference to interstate rendition of fugitives from justice which can be regarded as establishing any compact between the States of the Union, such as the Ashburton treaty contains, limiting their operation to particular or designated offences. On the contrary, the provisions of the organic and statutory law embrace crimes and offences of every character and description punishable by the laws of the State where the forbidden acts are committed. It is questionable whether the States could constitutionally enter into any agreement or stipulation with each other for the purpose of defining or limiting the offences for which fugitives would or should be surrendered. But it is settled by the decisions of this court that, except in the case of a fugitive surrendered by a foreign government, there is nothing in the Constitution, treaties or laws of the United States which exempts an offender, brought before the courts of a State for an offence against its laws, from trial and punishment, even though brought from another State by unlawful violence, or by abuse of legal process. . . . If a fugitive may be kidnapped or unlawfully abducted from the State or country of refuge, and be, thereafter, tried in the State to which he is forcibly carried, without violating any right or immunity secured to him by the Constitution and laws of the United States, it is difficult to understand upon what sound

principle can be rested the denial of a State's authority or jurisdiction to try him for another or different offence than that for which he was surrendered. If the fugitive be regarded as not lawfully within the limits of the State in respect to any other crime than the one on which his surrender was effected, still that fact does not defeat the jurisdiction of its courts to try him for other offences, any more than if he had been brought within such jurisdiction forcibly and without legal process whatever.

"We are not called upon in the present case to consider what, if any, authority the surrendering State has over the subject of the fugitive's rendition, beyond ascertaining that he is charged with crime in the State from which he has fled, nor whether the States have any jurisdiction to legislate upon the subject, and we express no opinion on these questions. To apply the rule of international or foreign extradition, as announced in *United States v. Rauscher*, 119 U. S. 407, to interstate rendition involves the confusion of two essentially different things, which rest upon entirely different principles. In the former the extradition depends upon treaty contract or stipulation, which rests upon good faith, and in respect to which the sovereign upon whom the demand is made can exercise discretion, as well as investigate the charge on which the surrender is demanded, there being no rule of comity under and by virtue of which independent nations are required or expected to withhold from fugitives within their jurisdiction the right of asylum. In the matter of interstate rendition, however, there is the binding force and obligation not of contract, but of the supreme law of the land, which imposes no conditions or limitations upon the jurisdiction and authority of the State to which the fugitive is returned. . . . The highest courts of the two States immediately or more directly interested in the case under consideration hold the same rule on this subject. The plaintiff in error does not bear in his person the alleged sovereignty of the State of New York, from which he was remanded, Dow's Case, 18 Penn. St. 37, but if he did, that State properly recognizes the jurisdiction of the State of Georgia to try and punish him for any and all crimes committed within its territory. But aside from this, it would be a useless and idle procedure

to require the State having custody of the alleged criminal to return him to the State by which he was rendered up in order to go through the formality of again demanding his extradition for the new or additional offences on which it desired to prosecute him: The Constitution and laws of the United States impose no such condition or requirement upon the State." (*Lascelles v. Georgia,* 148 U. S. 537, 541, 545, 546.)

This opinion is necessarily conclusive upon the question decided and deprives the decision in Hall's case of support on constitutional grounds. The subject of the return of a fugitive from justice found in one state, to the state from which he had fled, for prosecution and punishment was lifted bodily out of the law governing extradition in international cases, in which it had so long been submerged, and was given a standing and character of its own. The right of independent sovereignties to grant asylum, which is the nidus from which all the doctrines of international extradition took their rise, does not exist in any state of the American Union. In respect to the return of fugitives from justice, the various states are not to be regarded from the standpoint of international law as separate and independent sovereignties with selfish and jealous purposes to serve, but as governmental organizations having mutual interests, duties and relations and pledged to mutual support, each one acting as an instrumentality for the suppression of crime and the advancement of justice in the other. Such being the true attitude of the states toward each other, the constitution loses all semblance of a treaty between sovereigns and becomes a supreme law of the land for the promotion of the general welfare. The specification in the constitution of treason, felony and other crimes leaves no ground for distinction between political and other offenses, and no ground for the application of the rules and principles which govern in the case of limited treaty concessions hedged about by conditions and restrictions, express and implied. Disencumbered

*In re* Flack.

of the legal impedimenta attending the subject of international extradition the article of the constitution relating to interstate rendition is left to operate with all the force of its chaste simplicity and to fulfill the purpose expressed in the preamble:

"We, THE PEOPLE of the United States, in Order to form a more perfect Union, establish Justice, insure domestic Tranquility, provide for the common defence, promote the general Welfare, and secure the Blessings of Liberty to ourselves and our Posterity, do ordain and establish this CONSTITUTION for the United States of America."

A charge of crime, flight, discovery, and a formal demand for return are all that are necessary to raise the obligation to deliver up the fugitive, and that obligation is imperative. The act of congress passed to execute the provisions of the constitution is in full harmony with the spirit of that instrument. The duty to cause the fugitive to be arrested and delivered is imposed upon the executive authority of the state to which he has fled, without any of the reservations and restrictions imposed by other provisions of the act upon international extradition, to the end that state boundaries shall no longer act as barriers to the administration of justice.

Besides the constitutional ground, the decision in Hall's case was rested in part upon considerations of good faith and fair dealing. It was said that a state should not be allowed to obtain jurisdiction over a fugitive from justice for one purpose and then to take advantage of the jurisdiction thus obtained and use it for another and different purpose. No such question as this can arise between the state of Kansas and the state of New York in the present case, because the state of New York recognizes the right of any state to which it has delivered a fugitive from justice to try him for crimes other than the one specified in the requisition proceedings. With the asylum doctrine excluded from

consideration, however, no such question can arise in any case in which rendition is regularly sought in good faith under the constitution and the extradition act. To all intents and purposes the state upon which the demand is made is constituted an agency to supplement the judicial process of the demanding state, which otherwise could not be extended beyond its own boundaries, and the only right which the surrendering state has in the matter is to see that the prescribed conditions are present and that the prescribed formalities are observed. To hold a returned fugitive to answer for a crime different from that specified in the requisition is not to hold him for a purpose foreign to the original demand. The end to be accomplished is the punishment of crime. That end is constant and identical in both instances. The state to which the fugitive has fled has no right to detain him in opposition to the accomplishment of that end. It can not grant an asylum. It can not impose conditions upon surrender. Its duty to deliver up the fugitive on demand is immediate and imperative, and it would have no more discretion over a second demand than it had over the first. Consequently it can suffer no deprivation of right or affront to its sovereignty if, after surrender, the returned fugitive be dealt with in the same manner as if he had not fled.

So far as the fugitive himself is concerned, it is impossible that he should be prejudiced or defrauded by detaining him for trial upon other charges. He can not build up rights against the state whose laws he has broken by fleeing from its justice. He has no lawful right of asylum in any other state. By taking refuge in another state he acquires no right to demand conditions upon his return, and no conditions upon his return can be lawfully imposed by the surrendering state itself for his benefit. Consequently there is no implication that he is surrendered for the purpose of one proceeding only, and no implication of any limita-

*In re* Flack.

tion upon the jurisdiction and authority of the state to which he is returned. By resorting to compulsory proceedings to secure the return of a fugitive the state holds out no inducements whatever to him. It gives him no assurances that he will be afforded an opportunity to depart from its jurisdiction as soon as the charge specified in the requisition is disposed of. It obtains custody of him outside of the state, irrespective of his will or consent, precisely as it might do within its own borders if he had not fled, and it can not be guilty of bad faith when it is impossible for the fugitive to be overreached or misled and when no duty toward him, which the law governing the subject of rendition imposes, is violated.

In Hall's case the analogy was invoked of the exemption of suitors and witnesses attending court outside the jurisdiction of their home tribunals from service of judicial process. The analogy, however, fails. In such cases the party or witness has a personal right to all the benefits and advantages flowing from a lawfully established domicile and ought not to be held to waive them by answering a call to assist in the administration of justice elsewhere; while an offender against the criminal laws of a state acquires no right by flight which the court administering those laws is bound to regard when he is again found within its jurisdiction. (*Lascelles v. The State,* 90 Ga. 347, 368, 16 S. E. 945.) Besides this, the privilege is accorded to litigants and witnesses on grounds of public policy. The purpose is to subserve great public interests by promoting the administration of justice. (*Moletor v. Sinnen,* 76 Wis. 308, 312, 44 N. W. 1099.) That policy encourages the voluntary personal appearance in the trial of causes of persons whose presence is necessary for the better solution of controversies and whose attendance can not be compelled. (*Reid v. Ham,* 54 Minn. 305, 307, 56 N. W. 35.) No such considerations as these arise in favor of one who has fled from the scene

of his crime to defeat justice and who has been brought back by compulsory process. (*Rutledge v. Krauss,* 73 N. J. Law, 397, 63 Atl. 988.)

Speaking upon this subject the supreme court of Nebraska said:

"The immunity from service of process extended to suitors and witnesses attending court is founded on considerations of wisdom, and is well calculated to assist in the due administration of justice. It needs no argument to sustain the proposition that whatever encourages the attendance of witnesses at the trial of any case in controversy in the courts will conduce more certainly to a rightful determination and assure to a party litigant the protection of all his rights guaranteed by law. This desired result can best be accomplished by steadily adhering to a policy which will save to all, whose attendance is desirable in the furtherance of the ends of justice, and who come voluntarily, annoyance, inconvenience and oftentimes oppression by the service of process upon them while present in any stated jurisdiction for the purposes mentioned. This privilege has constantly been safeguarded by the courts, and the rule can doubtless be safely and confidently invoked by all who come within its scope and purview. The petitioner in the case at bar does not, however, come within the reason of the rule. His presence is involuntary and against his will. He was brought into the state forcibly and for the purpose of answering a charge of violating its laws. The reason for extending the rule of immunity is wanting in his case." (*In re Application of Walker,* 61 Neb. 803, 816, 86 N. W. 510.)

In the case of *The State v. McNaspy,* 58 Kan. 691, 50 Pac. 531, a fugitive from justice was found in another state by a pursuing deputy sheriff who held a warrant of arrest issued by a justice of the peace. Although informed of the officer's lack of authority to make an arrest, the fugitive voluntarily accompanied the officer to Kansas where he was prosecuted for a crime other than the one specified in the warrant. It was held that the prosecution might lawfully be maintained. In a dissenting opinion it was said that

*In re* Flack.

there is no conflict between Hall's case and *Lascelles v. Georgia,* 148 U. S. 537, but that in any event the argument based upon principles of good faith toward the surrendering sovereignty and the fugitive himself were sufficient to sustain the Hall decision.    Manifestly there is a direct conflict between the two decisions upon the constitutional question, and as already shown the good faith argument is unsound.

*Cannon's Case,* 47 Mich. 481, 11 N. W. 280, was cited in Hall's case as one of substantial authority. Courts and text-writers have experienced considerable difficulty in classifying that case, but its scope has been made clear by the supreme court of Michigan itself in the case of *In re Little,* 129 Mich. 454, 89 N. W. 38, wherein the doctrine of *Lascelles v. Georgia* is accepted and conclusions antagonistic to the decision in Hall's case are announced.

The case of *Ex parte, McKnight,* 48 Ohio St. 588, 28 N. E. 1034, was decided after the decision in the Rauscher case and before the decision in Lascelles' case.    The position was taken that the constitution is to be interpreted according to the rules, principles, and usages governing international extradition under treaties.    Rauscher's case was accepted as of controlling authority.    Nothing but the constitutional question was considered and consequently the grounds of the decision were invalidated by *Lascelles v. Georgia.*

Some fear has been expressed that unless a returned fugitive be allowed to depart in peace after the immediate purpose of the requisition proceeding has been accomplished interstate rendition may be abused for illegitimate private ends.    It is always open to the courts, however, to relieve against perversions of rendition process the same as they are in the habit of doing against perversions of ordinary judicial process.    The case of *The State v. Simmons,* 39 Kan. 262, 18 Pac. 177, furnishes an example of the latter kind.    A sheriff of this state, holding merely an

order to attach the person of a witness who was not a fugitive from justice, executed it in the state of Nebraska, in the night time, by force and violence. When the prisoner was brought within the jurisdiction of the court issuing the attachment a criminal complaint was lodged against him, upon which he was tried and convicted. In quashing the conviction the court said:

"It would not be proper for the courts of this state to favor, or even to tolerate, breaches of the peace committed by their own officers in a sister state, by sustaining a service of judicial process procured only by such a breach of the peace. Indeed, it would not be proper for any court in any state to sustain a service of any judicial process, either civil or criminal, where the service of such process was obtained only by the infraction of some law, or in violation of some well-recognized rule of honesty or fair dealing, as by force or fraud. Such a service would not only be a special wrong against the individual upon whom the service was made, but it would also be a general wrong against society itself—a violation of those fundamental principles of mutual trust and confidence which lie at the very foundation of all organized society, and which are necessary in the very nature of things to hold society together." (p. 264.)

On the same principle relief may be granted whenever rendition proceedings are in fact prostituted to fraudulent purposes.

In the course of this opinion the term interstate rendition has been used when speaking of the return of fugitives from one state to another, following a suggestion contained in the preface to Moore's admirable treatise on extradition and interstate rendition.

"In the judgment of the writer, such rendition is not properly described as extradition; for, as confirmed by the constitution and regulated by the legislation of Congress, it proceeds upon a principle precisely antipodal to that from which are derived the leading doctrines of extradition, in its true and in-

ternational sense. This is the necessary consequence not only of the form and character of the specific provision in the Constitution but also of the mutual relations, duties, and limitations of sovereignty of the States under the Federal government. Whatever may be our theories as to the duties of nations, the leading rules on the subject of extradition presuppose and are deduced from the right, in strict law, of every sovereign power to grant asylum to fugitives from justice. Such a right has no place among states united under a common government, and as between the States of the United States it is excluded by the explicit requirements of the Constitution. Since the accurate employment of terms is of the utmost importance, and the use of the word 'extradition' invites the application of the principles of international law to the interstate proceeding, the second part of the present work has been called Interstate Rendition." (I Moore on Extradition, p. VII.)

The decision in the case of *The State v. Hall,* 40 Kan. 338, 19 Pac. 918, is overruled and the petitioner is remanded to the custody of the sheriff of Dickinson county.